IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN T. GALANTE, *et al.*,

    *Plaintiffs*,

v.

OCWEN LOAN SERVICING LLC,

    *Defendant*.

Civil Action No. ELH-13-1939

**MEMORANDUM OPINION**

John and Denise Galante, plaintiffs, filed suit against defendant Ocwen Loan Servicing, LLC ("Ocwen"),[1] asserting a host of claims arising out of plaintiffs' mortgage financing for their home. *See* ECF 1 ("Complaint"). In particular, the Complaint seeks "Declaratory and Injunctive Relief" (Count I); asserts various statutory claims under the Maryland Consumer Protection Act, Md. Code (2013 Repl. Vol.), §§ 13-101 *et seq.* of the Commercial Law Article ("C.L.") (Count II), the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* (Count III), Maryland's Mortgage Fraud Protection Act, Md. Code (2010 Repl. Vol., 2013 Supp.), §§ 7-401 *et seq.* of the Real Property Article ("R.P.") (Count IV), and the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.* (Count V); and alleges common law claims for fraud (Count VI) and breach of contract (Count VII).[2]

Significantly, many of plaintiffs' allegations pertain to the period in which GMAC Mortgage, LLC ("GMAC" or "GMACM"), rather than Ocwen, was the servicer of plaintiffs'

---

[1] Plaintiffs refer to defendant as "OCWEN." However, I will use "Ocwen," which defendant itself uses, unless quoting language used by plaintiffs.

[2] As discussed, *infra*, the Complaint also makes passing references to claims for gross negligence and negligent misrepresentation. As to plaintiffs' federal claims, subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331. Supplemental jurisdiction may be exercised as to plaintiffs' state law claims under 28 U.S.C. § 1367.

mortgage loan.   However, GMAC is not a defendant in this action.   As a result, the fate of

plaintiffs' claims turns in part on the extent to which Ocwen may be liable for the alleged

conduct of GMAC.

Ocwen has filed a Motion to Dismiss (ECF 5, "Mot."), along with a supporting

memorandum (ECF 6, "Memorandum" or "Mem.") (collectively, the "Motion").   Plaintiffs

oppose the Motion (ECF 10, "Opposition" or "Opp."), and Ocwen has replied (ECF 11,

"Reply").[3]   No hearing is necessary to resolve the Motion.   *See* Local Rule 105.6.   For the

reasons that follow, I will grant the Motion in part and deny it in part.

## I.  Factual and Procedural Summary[4]

Plaintiffs, a married couple, are Maryland residents.   In 2005, they purchased real

property located at 6077 Welch Avenue, Deale, Maryland 20751, which is their family home

(the "Property").   *See* Complaint ¶¶ 7, 10, 21.   Ocwen is a provider of mortgage loan servicing

and collects residential mortgage loan debt.   *Id.* ¶¶ 8-9.

On February 14, 2007, plaintiffs refinanced their mortgage with Citywide Mortgage

Corporation.   Complaint ¶ 10.   The mortgage is evidenced by a note and secured by a deed of

trust, both dating from 2007, copies of which are attached to the Complaint.   *See id.* Exh. 1

---

[3] Plaintiffs attached 30 exhibits to the Complaint.   Defendant's Motion is supported by two exhibits: ECF 6-1 and 6-2.   Two exhibits are attached to the Opposition: ECF 10-1 (consisting of four letters, labeled Exhibits A1, A2, A3, and B) and ECF 10-2 (consisting of one letter, labeled Exhibit B).

[4] The summary is drawn largely from the Complaint.   Under Rule 12(b)(6), a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences in favor of the plaintiff.'"   *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).   But, as discussed *infra*, a court "may properly consider documents attached to a complaint or motion to dismiss 'so long as they are integral to the complaint and authentic.'"   *Anand v. Ocwen Loan Servicing, LLC*, --- F.3d ----, 2014 WL 2535405, at *2 (4th Cir. June 6, 2014) (quoting *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

(note) and Exh. 2 (deed of trust).[5]   On February 28, 2007, the loan was transferred to GMAC. Complaint ¶ 10.   Years later, on February 16, 2013, Ocwen acquired an interest in the note and the mortgage, following plaintiffs' alleged default.   *Id.* ¶¶ 10-11.   Based on the parties' submissions, it appears that plaintiffs continue to occupy the Property.

Central to this suit is a permanent loan modification agreement (the "Modification Agreement").   Plaintiffs allege the agreement was consummated in May 2011.   Complaint ¶ 12; *see id.* Exh. 15 (containing a copy of the Modification Agreement).   However, Ocwen, like GMAC before it, disputes the existence of a valid Modification Agreement.   *See* Complaint ¶ 12. Specifically, GMAC initially claimed that it had not received a signed copy of the Modification Agreement from plaintiffs, and later asserted that the loan modification was denied because plaintiffs had filed for bankruptcy.   *Id.*   For its part, Ocwen "claims the loan modification was denied because GMAC did not receive approval from the bankruptcy court" overseeing plaintiffs' bankruptcy proceedings.   *Id.*   Plaintiffs assert: "These false, misleading and often contradictory statements were deliberately made to either foreclose on their home and/or collect on any insurance it may have or attempt to force the Galantes [to] reapply for a loan modification[,] allowing OCWEN to tack on penalties and late fees."   *Id.*

According to plaintiffs, the allegations implicate a federal government program launched in 2009, the Making Home Affordable Program.   Complaint ¶ 15.   That program included the Home Affordable Modification Program ("HAMP"), which provides incentives for mortgage servicers to modify eligible first-lien mortgages.   *Id.* ¶ 16.   Plaintiffs posit: "HAMP uses incentive payments to encourage loan servicers and owners of mortgage loans or bonds backed by mortgage loans to modify eligible first lien mortgages so that monthly payments of

---

[5] Plaintiffs also refer to a second mortgage, identified as No. 8601816305, but it "is not subject to [the] Complaint."   *See* Complaint ¶ 36 & n.1.

homeowners who are in default or at imminent risk of default will be reduced to affordable and sustainable levels." Complaint ¶ 17. They maintain that GMAC and Ocwen each entered into agreements with the federal government under which the loan servicers "agreed to comply with HAMP and provide qualifying borrowers with permanent modifications." *See id.* ¶¶ 18-20.

Plaintiffs allege that the income of Mr. Galante, who worked in the construction industry, fell by more than 50 percent in the wake of the housing market's collapse. *Id.* ¶ 23. In November 2010, plaintiffs contacted GMAC to inquire about restructuring their mortgage to reduce their monthly payments. *Id.* ¶ 24. However, GMAC informed plaintiffs that they were ineligible for HAMP because, at that time, plaintiffs were current on their mortgage payments. *Id.* A GMAC representative told the Galantes to contact the company again after they had missed three mortgage payments. *Id.* Subsequently, on December 2, 2010, GMAC sent a letter to plaintiffs indicating that "they were 30 days or more past due on their loan and the amount due was $8,499.33." *Id.* ¶ 25. *See id.* Exh. 3 (letter of Dec. 2, 2010). The letter invited the Galantes to contact GMAC in the event they were "experiencing financial difficulties," and noted that the company "offer[s] a number of programs that, based on [plaintiffs'] circumstances, may help bring [their] account current." Complaint Exh. 3. After plaintiffs received another letter from GMAC, dated December 13, 2010, indicating that plaintiffs were in default, they again contacted GMAC to discuss the possibility of a loan modification. Complaint ¶¶ 26-27; *see id.* Exh. 4 (letter of Dec. 13, 2010). At that time, a GMAC representative told plaintiffs "that if they submitted a modification application," GMAC "would process their application under HAMP." Complaint ¶ 27.

On or about December 14, 2010, plaintiffs applied for a HAMP mortgage modification. *Id.* ¶ 28. According to plaintiffs, in support of the application, they sent GMAC "all requested

financial information and documents, including a Hardship Affidavit." *Id.* ¶ 28.  Nevertheless, on December 17, 2010, plaintiffs received a letter from GMAC stating that they had failed to provide documents required to establish their financial hardship.  *Id.*; *see id.* Exh. 5 (letter of Dec. 17, 2010).  Plaintiffs resubmitted the requested documents to GMAC's loss mitigation department on December 22, 2010, while also notifying GMAC that they were filing for bankruptcy, and supplying the contact information of their bankruptcy attorney.  Complaint ¶ 29; *see id.* Exh. 6 (fax cover sheet from Galantes to GMAC, dated Dec. 22, 2010).  The next day, GMAC sent plaintiffs a letter stating that it was processing their request and would respond, in writing, within 20 business days.  Complaint ¶ 30; *see id.* Exh. 7 (letter of Dec. 23, 2010).

Thereafter, on January 12, 2011, in the U.S. Bankruptcy Court for the District of Maryland, plaintiffs filed a Voluntary Petition under Chapter 7.  Complaint ¶ 31; *see* Case No. 11-10671 (Bankr. D. Md.).  At that time, plaintiffs also filed a Statement of Intention in their bankruptcy case, indicating that they would retain the Property and continue to make payments. Complaint ¶ 32; *see id.* Exh. 8 ("Chapter 7 Individual Debtor's Statement of Intention") at 2. According to plaintiffs, "GMAC did not file an objection to discharge, adversary proceeding, or request relief from the automatic stay."  Complaint ¶ 33.  Instead, following plaintiffs' bankruptcy filing, "GMAC began working with the Galantes to obtain a loan modification for their first mortgage." *Id.* ¶ 34.

Plaintiffs allege that a "loan modification trial period" began in February 2011, and that their "mortgage payment was reduced from $3,901.00 to $2,593.32."  Complaint ¶ 35.  They made their first "trial period mortgage payment" on February 4, 2011.  *Id.* ¶ 36.  According to plaintiffs, "GMAC continued to accept the agreed reduced mortgage payments each and every

month until February 2013, when the servicing rights were acquired by OCWEN." *Id.* ¶ 37.[6]

As evidence that GMAC approved the loan modification, plaintiffs cite a letter from GMAC dated March 21, 2011, stating that the Property is located in a "Special Flood Hazard Area," and noting that GMAC "was required to notify" plaintiffs of that fact "[a]s a result of [their] recent approval for a loan modification and to comply with federal laws and regulations . . . ." Complaint Exh. 10 (letter dated Mar. 21, 2011); *see* Complaint ¶ 38.  Plaintiffs also point to a letter from GMAC dated May 2, 2011, which indicated that GMAC's receipt of a recent payment "successfully completes the trial period of the loan workout plan," and advised that plaintiffs' "account will now be processed for a permanent modification."  Complaint Exh. 11; *see* Complaint ¶ 39.  That letter stated, in a list of frequently asked questions, *id.* Exh. 11:

> *Am I guaranteed a permanent modification?*

> > We cannot guarantee you will be offered a modification.  Although you have successfully made all the required trial period payments, we must still verify that you meet all of the other requirements of the program.  If your request is denied, you will be provided the reason for denial in writing within 30 days.

In another letter from GMAC that plaintiffs cite, dated May 10, 2011, GMAC advised: "Our records confirm you have completed the trial modification and have been approved for a permanent modification through the government's Making Home Affordable program." Complaint Exh. 12; *see* Complaint ¶ 40.

A subsequent letter from GMAC, dated May 16, 2011, stated:  "Congratulations!  You are eligible for a Home Affordable Modification.  As previously described, if you comply with the terms of the Home Affordable Modification Trial Period Plan, we will modify your mortgage

---

[6] Attached to the Complaint as Exhibit 9 is a document plaintiffs identify as a bank statement reflecting all monthly mortgage payments made to GMAC.  *See* Complaint ¶ 36. However, that document reflects that payments began in June 2011, not February 2011.  *See* Exh. 9 at 2.

loan and waive all prior late charges that remain unpaid." Complaint Exh. 13; *see* Complaint ¶ 41. Below a caption stating, "How to Accept This Offer," the letter identified two requirements that plaintiffs had to fulfill: (1) "COMPLETE AND RETURN THE ENCLOSED [Modification] AGREEMENT BY THE DUE DATE"; and (2) "CONTINUE TO MAKE YOUR TRIAL PERIOD PAYMENTS ON TIME." Complaint Exh. 13. Further, the letter stated that plaintiffs "must sign and return the Modification Agreements to [GMAC] in the enclosed, pre-paid envelope by 5/26/2011." *Id.* Under a caption stating, "We are still in need of the following documentation to execute the modification agreement," the letter advised: "All required documents have been received." *Id.* The letter concluded: "We look forward to hearing from you no later than 5/26/2011." *Id.* Also on May 16, 2011, plaintiffs faxed GMAC a letter indicating that they had no disqualifying criminal convictions. Complaint ¶ 42; *see id.* Exh. 14 (fax cover sheet and verification form).

Plaintiffs allege that they executed the Modification Agreement and returned it to GMAC on May 24, 2011. Complaint ¶ 43; *see id.* Exh. 15 (executed Modification Agreement). The Modification Agreement was signed by an authorized officer of GMAC on May 27, 2011. Complaint ¶ 43; *see id.* Exh. 15 at 9 (containing, under the heading "LENDER ACKNOWLEDGEMENT," the illegible signature of an "Authorized Officer," dated May 27, 2011). Plaintiffs also maintain that a "Mr. Cain," an employee of GMAC, confirmed GMAC's receipt of the signed Modification Agreement in late May 2011. Complaint ¶ 44.[7]

The Modification Agreement begins: "If my representations in Section 1 continue to be true in all material respects, then this Modification Agreement ('Agreement') will, as set forth in

---

[7] The Complaint is ambiguous as to whether the conversation with Mr. Cain occurred in late May 2011. However, it appears that plaintiffs have alleged that GMAC received the signed Modification Agreement in late May 2011, and that "Mr. Cain" also confirmed the receipt of the signed agreement at that time.

Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."   Complaint Exh. 15.   Near the top of the second page, the Modification Agreement states:   "This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied."   *Id*.   Under the heading "Acknowledgements and Preconditions to Modification," the Modification Agreement reads:   "I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) has occurred.   I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement."   *Id.*

In a letter from GMAC dated May 25, 2011, GMAC informed plaintiffs that it was "unable to finalize [their] modification without the required documentation."   Complaint Exh. 16; *see* Complaint ¶ 45.   The letter further advised: "Modification documents were mailed to you to be executed and returned to our office within 7-days.   The timeframe allowed to return your signed modification agreement has expired; therefore, it is very important you return the documents to our office immediately or your modification request will be canceled."   Complaint Exh. 16.   The seven-day period referenced in GMAC's letter of May 25, 2011, is inconsistent with the language found in GMAC's letter of May 16, 2011.   Specifically, in the letter of May 16, 2011, GMAC stated that plaintiffs "must sign and return the Modification Agreements to [GMAC] in the enclosed, pre-paid envelope by 5/26/2011."   Complaint Exh. 13.   And, that letter said: "We look forward to hearing from you no later than 5/26/2011."   *Id.*

In a letter dated July 11, 2011, GMAC advised—falsely, according to plaintiffs—that the request for a loan modification was denied because the "[s]igned HAMP Modification

Agreement was not returned by [the] customer."  Complaint Exh. 18; *see* Complaint ¶ 46.

Ms. Galante contacted GMAC on July 21, 2011, and spoke with an employee, "Marlene," who informed Ms. Galante that GMAC had "received the necessary paperwork" on time. Complaint ¶ 47.  "Marlene" stated that she would "straighten out the mix-up" and advised Ms. Galante to "disregard" the letter from GMAC dated July 11, 2011.  *Id.*  Plaintiffs did not hear otherwise from GMAC for approximately ten months.  *Id.* ¶ 49.  During that time, plaintiffs continued to make mortgage payments and "had every indication that the mix-up was resolved because they did not hear otherwise until May 25, 2012."  *Id.*  Also, on May 15, 2012, plaintiffs "received their Final Decree from the United States Bankruptcy Court for the District of Maryland closing their Chapter 7 Bankruptcy case."  *Id.* ¶ 48; *see id.* Exh. 19 (Final Decree in Case No. 11-10671 (Bankr. D. Md.), ECF 41).

In a letter dated May 25, 2012, GMAC informed plaintiffs:  "We have not received your mortgage payments for the months of 10/01/11 through 05/01/12.  This means your account is now in default."  Complaint Exh. 20; *see* Complaint ¶ 49.  Plaintiffs assert that this statement was false.  *See id.* ¶ 49.  Thereafter, plaintiffs received a notice from GMAC dated July 2, 2012, which indicated that their last payment had been received on September 1, 2011, and provided a "Date of Default" of October 2, 2011.  Complaint Exh. 21; *see* Complaint ¶ 50.

On August 10, 2012, Ms. Galante spoke with a GMAC employee, "Fredrick," via telephone, and requested a copy of the signed Modification Agreement.  Complaint ¶ 51. "Fredrick" acknowledged that GMAC had received a copy of the signed Modification Agreement, but he told Ms. Galante that he was unable to send her a copy.  *Id.*[8]  Additionally,

---

[8] Plaintiffs advise that Ocwen later sent them a copy of the Modification Agreement, at their request, which reflected the signature—apparently of GMAC's authorized officer—dated May 27, 2011.  Complaint ¶ 51 n.3.  As noted, that version is attached as part of Exhibit 15 to the

"Fredrick" said "that the Galantes would have to begin the loan modification process all over again or GMAC would begin foreclosure proceedings." Complaint ¶ 51. Ms. Galante responded that plaintiffs had returned the signed Modification Agreement along with the other necessary documentation and had made every mortgage payment since the approval of the loan modification. Complaint ¶ 52. She also told "Frederick" that "Mr. Cain," another GMAC employee, had "verified that the Galantes did everything required to provide the necessary documents and make all of the required mortgage payments." *Id.* "Fredrick" replied that plaintiffs would have to start the modification process anew or face foreclosure, and that even if GMAC were at fault in its handling of plaintiffs' documents, "it was too late to go back and fix it." Complaint ¶ 53.

In a letter from GMAC to plaintiffs dated September 5, 2012, GMAC stated that it had not received "mortgage payments for the months of 12/01/11 through 09/01/12." Complaint Exh. 22. The letter indicated that, to avoid foreclosure, $41,034.35 was due. *Id.*; *see* Complaint ¶ 54. By letter of September 6, 2012, GMAC advised plaintiffs that it had "recently received [plaintiffs'] request for a loan modification," but stated that it was unable to fulfill that request because it had "previously requested additional information from [plaintiffs] which has not been received," and thus it was "unable to continue [its] review for workout solutions." Complaint Exh. 23; *see* Complaint ¶ 55. In a letter from GMAC to plaintiffs dated October 12, 2012, GMAC advised that a payment of $42,705.12 was required to bring the account current and that the Property may be referred for foreclosure in 14 days. Complaint Exh. 24; *see* Complaint ¶ 56. And, in a letter from GMAC to plaintiffs dated December 3, 2012, plaintiffs were advised that they owed $48,171.90, based on non-payment "for the months of 01/01/12 through 12/01/12."

---

Complaint. It appears undisputed that GMAC never provided plaintiffs with that version of the Modification Agreement.

Complaint Exh. 25; *see* Complaint ¶ 57.  If plaintiffs did not pay that amount, the letter said, foreclosure would follow.  Complaint Exh. 25.

On January 10, 2013, an individual, later identified as a GMAC inspector, came to the Property and took photographs, leading plaintiffs to infer that a foreclosure sale "was imminent." Complaint ¶ 58.  In a letter to plaintiffs dated January 23, 2013, GMAC stated that mortgage payments had not been received "for the months of 02/01/12 through 01/01/13," adding that $50,325.98 was due at that time.  Complaint Exh. 26; *see* Complaint ¶ 59.  Like other letters from GMAC, this letter advised that, if plaintiffs did not pay the amount due, foreclosure proceedings would be initiated.  Complaint Exh. 26.

In a letter dated February 7, 2013, GMAC advised plaintiffs: "The servicing of your mortgage loan, that is, the right to collect payments from you," was being transferred to Ocwen, "effective February 16, 2013."  Complaint Exh. 27; *see* Complaint ¶ 60.  Thereafter, on February 28, 2013, Ocwen sent plaintiffs a "NOTICE OF INTENT TO FORECLOSE."  Complaint Exh. 28; *see* Complaint ¶ 61.  According to plaintiffs, in March 2013—and, apparently, in subsequent months—Ocwen refused to accept the Galantes' mortgage payments.  *See* Complaint ¶ 62. Plaintiffs assert: "All returned mortgage payments have been deposited into a trust account."  *Id.* Additionally, in a letter dated March 6, 2013, Ocwen advised that payment on plaintiffs' account was past due and that the Property may be referred for foreclosure.  Complaint Exh. 29; *see* Complaint ¶ 63.  A subsequent account statement from Ocwen, dated March 18, 2013, indicated that plaintiffs owed a total of $59,888.04.  Complaint Exh. 30; *see* Complaint ¶ 64.

Plaintiffs insist that they "have made or attempted to make all required payments pursuant to the loan modification agreement entered into with GMAC in February of 2011." Complaint ¶ 65.  Plaintiffs also allege that they sent Ocwen letters dated February 14, 2013,

March 1, 2013, and May 3, 2013, requesting that Ocwen honor the Modification Agreement and "giving it an opportunity to rectify its wrongful collection actions and threats." *See* Complaint ¶¶ 13, 66.[9]  However, Ocwen refused those requests, and instead referred plaintiffs' account to the office of Samuel I. White, P.C., to commence foreclosure. *Id.* ¶ 13.

Further, plaintiffs allege that "OCWEN responded with misinformation asserting the loan modification was denied because GMAC required but never received Bankruptcy Court approval." Complaint ¶ 67.  According to plaintiffs, GMAC had never revealed that particular reason to them. *Id.*[10]  Of relevance here, a letter from Ocwen dated March 6, 2013, is attached to the Complaint. *See id.* Exh. 17.  In that letter, Ocwen advised:

> A chapter 7 bankruptcy was filed by both mortgagors on January 12, 2011.  Due to the bankruptcy filing, any payment assistance option offered by GMACM would have to be also approved by the bankruptcy court in order to fully execute any change of the payment.

> The trial payment plan was successfully completed on May 1, 2011.  A HAMP permanent modification was approved with new payments beginning June 1, 2011, in the amount of $2,593.32.  Please be advised, as the account was involved in bankruptcy proceedings when the modification was approved, the permanent modification needed to be approved by the bankruptcy court in order to execute the modification.

Plaintiffs allege that "GMAC engaged in a pattern of unfair and deceptive practices" that included, *inter alia*, "providing false or misleading information to the Galantes"; threatening foreclosure despite receiving the Galantes' mortgage payments; "failing to properly process the Galantes' application for a loan modification"; and "misleading the Galantes by providing false or deceptive reasons for denial of their loan modification." *See* Complaint ¶ 71.  In plaintiffs'

---

[9] These letters were not attached to the Complaint.  However, they are attached to the Opposition. *See* Opp. Exh. A-1 through A-3 (ECF 10-1).

[10] As indicated, plaintiffs acknowledge that GMAC had, on at least one occasion, told plaintiffs "that the loan modification was denied because the Galantes had filed for Bankruptcy." Complaint ¶ 12.

view, Ocwen is "subject to all claims that Plaintiffs could bring against GMAC which arise from GMAC's conduct as alleged" in the Complaint, "all of which was known to OCWEN at the time it undertook servicing of Plaintiffs' loan." *Id.* ¶ 14.  In this regard, plaintiffs assert:  "OCWEN knew of GMAC's pattern of misconduct but proceeded with its wrongful conduct as alleged herein despite its knowledge of history of this case." *Id.*   ¶ 73.  *See also id.* ¶ 13 (Ocwen was "fully aware of GMAC's wrongful conduct").   Moreover, they claim that Ocwen "continues GMAC's wrongful conduct with full knowledge that a valid fully executed [M]odification [A]greement exists, thereby ratifying GMAC'[s] wrongful conduct." *Id.* ¶ 14.

Additional facts are included in the Discussion.

## II.  Legal Standards

Ocwen's Motion is predicated on Fed. R. Civ. P. 12(b)(6).  A motion to dismiss pursuant to Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Thus, a Rule 12(b)(6) motion tests the sufficiency of a complaint.  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 n.3 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  But, the rule demands more than bald accusations or mere

speculation. *Id.*; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. and Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, --- U.S. ---, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010). However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Twombly*, 550 U.S. at 555.

A Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). The court is not required to accept legal conclusions drawn from the facts, however. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385-86. "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert.*

*denied*, --- U.S. ---, 132 S. Ct. 1960 (2012).  "'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'"  *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.'  Dismissal is appropriate if the law simply affords no relief.") (citation omitted).

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards*, 178 F.3d at 243 (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint.  *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6).  *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

Several of plaintiffs' claims implicate the heightened pleading standard under Fed. R. Civ. P. 9(b).  *Cozzarelli v. Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 629 (4th Cir. 2008).  The rule states: "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ."  Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th

Cir. 2010) (citation omitted); *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'"  *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

As the Fourth Circuit has said, Fed. R. Civ. P. 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . .  Second, Rule 9(b) exists to protect defendants from frivolous suits.  A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery.  Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

*Harrison*, 176 F.3d at 784 (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)).

By its terms, however, Rule 9(b) permits a general averment of aspects of fraud that relate to a defendant's state of mind.  It states, in part:  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'"  *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord Gadson v. Supershuttle Int'l*, 2011 WL 1231311, at *9 (D. Md. Mar. 30, 2011).  Thus, "[i]n cases involving concealment or omissions of material facts, . . . meeting Rule 9(b)'s particularity requirement will likely take a different form."  *Piotrowski v. Wells Fargo Bank, N.A.*, 2013 WL 247549 (D. Md. Jan. 22, 2013) (citing *Shaw*, 973 F. Supp. at 552).  And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the

defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). However, in considering a challenge to the adequacy of the Complaint, the court "may properly consider documents attached to a complaint or motion to dismiss 'so long as they are integral to the complaint and authentic.'" *Anand v. Ocwen Loan Servicing, LLC*, --- F.3d ----, 2014 WL 2535405, at *2 (4th Cir. June 6, 2014) (quoting *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448. To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

### III. Discussion

A. Preliminary Matters

Before addressing each count raised in plaintiffs' Complaint, it is helpful to provide background with respect to HAMP. In *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 773 (4th Cir. 2013), the Fourth Circuit explained: "HAMP was part of Congress's response to the financial and housing crisis that struck the country in the fall of 2008. It provided an incentive for lenders to modify mortgages so that struggling homeowners could stay in their homes. *See* 'Emergency Economic Stabilization Act of 2008,' Pub L. No. 110-343, 122 Stat. 3765 (2008),

codified at 12 U.S.C. § 5201 *et seq.*"

The *Spaulding* Court quoted at length from a Seventh Circuit decision describing the

Emergency Economic Stabilization Act and the role of HAMP:

> "The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to 'implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures.' 12 U.S.C. § 5219(a). Congress also granted the Secretary the authority to 'use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures.' *Id.*

> "Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure.  The Secretary negotiated Servicer Participation Agreements (SPAs) with dozens of home loan servicers, including Wells Fargo.  Under the terms of the SPAs, servicers agreed to identify homeowners who were in default or would likely soon be in default on their mortgage payments, and to modify the loans of those eligible under the program.  In exchange, servicers would receive a $1,000 payment for each permanent modification, along with other incentives.  The SPAs stated that servicers 'shall perform the loan modification . . . described in . . . the Program guidelines and procedures issued by the Treasury . . . and . . . any supplemental documentation, instructions, bulletins, letters, directives, or other communications . . . issued by the Treasury.' In such supplemental guidelines, Treasury directed servicers to determine each borrower's eligibility for a modification . . . :

>> [T]he borrower had to meet certain threshold requirements, including that the loan originated on or before January 1, 2009; it was secured by the borrower's primary residence; the mortgage payments were more than 31 percent of the borrower's monthly income; and, for a one-unit home, the current unpaid principal balance was no greater than $729,750 . . . .

> "Where a borrower qualified for a HAMP loan modification, the modification process itself consisted of two stages.  After determining a borrower was eligible, the servicer implemented a Trial Period Plan (TPP) under the new loan repayment terms it formulated using the waterfall method.  The trial period under the TPP lasted three or more months, during which time the lender 'must service the mortgage loan . . . in the same manner as it would service a loan in forbearance.' Supplemental Directive 09–01.  After the trial period, if the borrower complied with all terms of the TPP Agreement—including making all required payments

and providing all required documentation—and if the borrower's representations remained true and correct, the servicer had to offer a permanent modification. *See* Supplemental Directive 09–01 ('If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period . . . .')."

*Spaulding*, 714 F.3d at 773 (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556-57 (7th Cir. 2012)) (alterations in *Spaulding*).

Ocwen raises several contentions in its Motion that cut across plaintiffs' claims. To begin, Ocwen maintains that the suit amounts to "an effort to strong-arm a loan modification from Ocwen," and to hold Ocwen liable for the acts of GMAC. Mem. at 1. It characterizes plaintiffs' claims as premised on an alleged Modification Agreement that "was never approved nor implemented by GMAC." *Id.* Ocwen also insists that, after the transfer of the loan from GMAC, "OCWEN has acted in good faith, and has at all times been responsive to the Plaintiffs' repeated requests for information." *Id.*

Regarding Ocwen's liability for the alleged acts or omissions of GMAC, Ocwen argues that its own "acquisition of the servicing rights for [plaintiffs' loan] came with an express disclaimer of liability for the prior acts of GMAC." Mem. at 6. In connection with Ocwen's claim that it has no liability for GMAC's conduct, Ocwen relies on a court order dated November 21, 2012, issued by the bankruptcy court overseeing the Chapter 11 bankruptcy of Residential Capital, LLC and various of its affiliates and subsidiaries, including GMAC. Mem. at 6 (citing *In re Residential Capital, LLC*, Case No. 12-12020 (Bankr. S.D.N.Y. 2012), ECF 2246 (the "ResCap Order"), attached to the Motion as Exhibit B). Ocwen explains that the ResCap Order approved the sale to Ocwen of certain assets belonging to GMAC, including the servicing of plaintiffs' mortgage. Mem. at 6. Further, Ocwen asserts that the ResCap Order "contains multiple paragraphs barring any successor liability for acts or omissions by the seller

and its affiliates." *Id.* at 6 (citing Mot. Exhibit B). In Ocwen's view, the Galantes' "sole remedy for any acts or omissions by GMAC would [have been] filing a claim prior to the claims bar date in the [Residential Capital, LLC] bankruptcy," and plaintiffs' "attempts to hold Ocwen responsible for acts of GMAC that occurred in 2011 and 2012 are thus ineffectual." Mem. at 7.

Plaintiffs challenge defendant's claim that the ResCap Order presents a barrier to the claims in this suit. According to plaintiffs, the Complaint "states claims against *OCWEN* for its actions in servicing the loan subsequent to the assumption." Opp. at 8 (emphasis in original). In any event, and as further addressed, *infra*, I need not decide the impact, if any, of the ResCap Order on the scope of plaintiffs' claims.

## B. Breach of contract

Plaintiffs' suit is premised largely on the claim that it entered into a valid Modification Agreement. Moreover, they claim that Ocwen is liable for breach of contract in regard to the Modification Agreement. *See* Complaint Count VII. In my view, the validity of the Modification Agreement permeates the entire suit. Therefore, I will address this claim first.

The parties do not discuss choice of law. Instead, they rely on Maryland law, both in general and in connection with the breach of contract claim. *See* Mem. at 20-22; Opp. at 27-28.

"In a federal question case that incorporates a state law issue, . . . a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise." *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).[11] As to contract claims, Maryland applies the law of the state where the contract was made ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g., Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295,

---

[11] Similarly, a federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice-of-law rules. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007).

1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012); *see also, e.g.*, *Hausfeld v. Love Funding Corp.*, --- F. Supp. 2d ----, 2014 WL 1573009, at *9 (D. Md. Apr. 18, 2014); *Key Government Finance, Inc. v. E3 Enterprises Inc.*, --- F. Supp. 2d ----, 2014 WL 858424, at *2 (D. Md. Mar. 4, 2014).  For choice-of-law purposes, "a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002).  And, "[c]ontracts relating to the sale of realty are generally governed by the law of the jurisdiction in which the property is located." *Traylor v. Grafton*, 273 Md. 649, 660, 332 A.2d 651, 659 (1975).  Here, the deed of trust pertaining to the Property states: "This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located." Complaint Exh. 2 at 10.  In light of these considerations, and like the parties, I will apply Maryland law to Count VII.

The crux of plaintiffs' claim is that the Modification Agreement altered the terms of the mortgage on the Property and the note secured by the mortgage, but that Ocwen refuses to honor the terms of that modification.  According to plaintiffs, the Modification Agreement that GMAC sent to them "constitutes a valid offer," which plaintiffs accepted by executing and returning the Modification Agreement to GMAC.   Complaint ¶¶ 145-46.   Plaintiffs add that GMAC "subsequently executed the [Modification Agreement] . . . thereby form[ing] a valid contact." *Id.* ¶ 147.  Plaintiffs assert that, "[b]y failing to honor" the valid Modification Agreement, Ocwen is liable for breach of contract. *Id.* ¶ 149.

Under Maryland law, "'[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted); *see Sy-Lene of Washington, Inc. v. Starwood Urban*

*Retail II, Inc.*, 376 Md. 157, 166, 829 A.2d 540, 546 (2003). To determine the parties' intentions, courts first look to the written language of the contract. *Id.* "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citation omitted).

When a contract's language is clear and unambiguous, "its construction is for the court to determine." *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001); *see DIRECTV, Inc.*, 376 Md. at 312, 829 A.2d at 632 ("[W]here the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court."). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001).

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.*, 392 Md. 601, 624, 898 A.2d 472, 485 (2006). "It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not

rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

A "contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *see Cochran v. Norkunas*, 398 Md. 1, 17, 919 A.2d 700, 710 (2007); *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris*, 353 Md. at 436, 727 A.2d at 363. To determine whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985); *see Young v. Anne Arundel Cnty.*, 146 Md. App. 526, 587, 807 A.2d 651, 687 (2002).

In the context of a motion to dismiss, the construction of an ambiguous contract "'is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'" *Horlick v. Capital Women's Care, LLC*, 896 F. Supp. 2d 378, 394 (D. Md. 2011) (applying Maryland contract law) (quoting *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir. 1972)); *see also Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 98 (4th Cir. 1992) (applying Maryland contract law and reversing trial court's grant of a motion to dismiss because the contract in issue was "not free of ambiguity"); *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 736 (D. Md. 2005) (applying Ohio contract law and noting that "an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim").

"If the contract is ambiguous," the court may, at an appropriate time, "consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution

of the contract." *Cnty. Commissioners of Charles Cnty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010).  In the context of summary judgment, if "extrinsic evidence . . . leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.'"  *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511, 526 (D. Md. 2012) (quoting *Washington Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007)).

As an initial matter, Ocwen insists that plaintiffs' breach of contract claim amounts to an effort to hold it responsible for GMAC's alleged breach of the Modification Agreement.  Mem. at 21.  To that end, Ocwen notes that it "became the servicer of the Loan many months after GMAC allegedly breached the loan modification that Plaintiffs claim to have entered."  *Id.*  Although Ocwen acknowledges that plaintiffs "allege that Ocwen was the assignee," it insists that plaintiffs "do not allege that Ocwen expressly assumed liability for any former breaches GMAC engaged in that may have later come to light."  *Id.*  In Ocwen's view, absent allegations of "an express assumption of liability" on its part, plaintiffs fail to state a viable breach of contract claim against Ocwen.  *Id.*

Defendant also argues that plaintiffs' suit is based on the false premise that a valid Modification Agreement exists.  Mem. at 1.  Rather, defendant maintains, "the alleged loan modification agreement was never approved nor implemented by GMAC."  *Id.*  Defendant points out that plaintiffs "never received a final agreement executed by GMAC" and, instead, received a letter "advising them that their application for a modification had been denied."  *Id.*

In the Opposition, plaintiffs dispute Ocwen's claim that no agreement was formed.  Opp. at 6.  According to plaintiffs, Ocwen's Motion also "attempts to turn the focus away from its contractual duty to the Galantes" by claiming that Ocwen "is not responsible for GMAC's bad acts."  *Id.* at 27-28.  Plaintiffs emphasize that Ocwen, not GMAC, is the defendant in this suit, and that Ocwen "is being held to task here for its [own] behavior."  *Id.* at 28.

It is uncontested that the servicing of plaintiffs' mortgage loan was transferred from GMAC to Ocwen in February 2013.  *See* Complaint ¶ 10 (alleging that Ocwen acquired an interest in the note and mortgage on February 16, 2013); Complaint Exh. 17 (letter from Ocwen to plaintiffs' counsel stating that the "loan was recently transferred from GMACM to Ocwen Loan Servicing, effective February 16, 2013"); Mem. at 1 ("Servicing of the Loan subsequently transferred to Ocwen[.]").  Moreover, "a plaintiff may rely on the promise of a predecessor-in-interest to establish the existence or terms of the assigned agreement."  *Bezmenova v. Ocwen Financial Corp.*, 2013 WL 3863948, at *7 (D. Md. July 23, 2013).  And, the Modification Agreement makes clear that it modifies both the mortgage and the note (referred to collectively in the Modification Agreement as the "Loan Documents").[12]  Complaint Exh. 15.  In my view, defendant has failed to show how it is contractually immune from the modification, if—as plaintiffs allege—they entered into a valid Modification Agreement with GMAC, thereby modifying the mortgage and the note in which Ocwen acquired an interest.

Turning to the Modification Agreement's validity, plaintiffs allege that they executed the Modification Agreement and returned it to GMAC on May 24, 2011.  Complaint ¶ 43; *see id.* Exh. 15 (executed Modification Agreement).  An authorized officer of GMAC allegedly signed the Modification Agreement on May 27, 2011.  Complaint ¶ 43; *see id.* Exh. 15 at 9 (containing,

---

[12] Although the Modification Agreement often refers to "the Mortgage" and "the Note," and not to a deed of trust, the first paragraph states:  "The Note is secured by a Mortgage, Deed of Trust, or Deed to Secure Debt (the 'Security Instrument') . . . ."  *See* Complaint Exh. 15.

under the heading "LENDER ACKNOWLEDGEMENT," the illegible signature of an "Authorized Officer," dated May 27, 2011).  Further, plaintiffs maintain that a "Mr. Cain," an employee of GMAC, confirmed that GMAC had received the Modification Agreement signed by plaintiffs.  Complaint ¶ 44.

In the Motion, defendant argues, in essence, that conditions necessary to the formation of an enforceable Modification Agreement were not met.  *See* Mem. at 1; *see also* Reply at 3 ("Plaintiffs must be held to the express conditions precedent in the document that they signed; no modification agreement went into effect.").   Of relevance to that argument, a "'condition precedent in a contract is a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises.'"  *Azimirad v. HSBC Mortg. Corp.*, 2011 WL 1375970, at *3 n.2 (D. Md. Apr. 12, 2011) (Chasanow, J.) (quoting *All State Home Mortg., Inc. v. Daniel*, 187 Md. App. 166, 182, 977 A.2d 438, 447 (2009)). "Although no particular form of words is necessary in order to create an express condition, such words and phrases as 'if' and 'provided that,' are commonly used to indicate that performance has expressly been made conditional, as have the words 'when,' 'after,' 'as soon as,' or 'subject to[.]'"  *Chiricella v. Erwin*, 270 Md. 178, 182, 310 A.2d 555, 557 (1973) (citations omitted).  At its core, "[t]he determination of whether a provision in a contract constitutes a condition precedent is a question of construction dependent on the intent of the parties."  *N.Y. Bronze Powder Co., Inc. v. Benjamin Acquisition Corp.*, 351 Md. 8, 14 n.2, 716 A.2d 230, 233 n.2 (1998).  Where ambiguity exists, the question of whether a given contractual provision qualifies as a condition precedent is an "inappropriate determination at the pleading stage."  *Azimirad*, 2011 WL 1375970, at *4.

Moreover, some acts provided for in a contract may not qualify as a condition precedent,

and instead may simply serve to memorialize the agreement between the parties.  *See Azimirad*, 2011 WL 1375970, at *4 (observing that a lender's act of signing an agreement may be "one step in the parties' process of memorializing their existing agreement," rather than a condition precedent); *see also Atl. Banana Co. v. Standard Fruit & S.S. Co.*, 493 F.2d 555, 559 (5th Cir. 1974) ("[A]s prudent businessmen, the parties simply intended to memorialize their already obligatory agreement, rather than create a condition precedent to liability.")

Here, a number of provisions found in the Modification Agreement and associated documents are pertinent.  The first sentence of the Modification Agreement provides:  "If my representations in Section 1 continue to be true in all material respects, then this Modification Agreement ('Agreement') will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  Complaint Exh. 15.  Section 1, titled "My Representations," contains various statements pertaining, *inter alia*, to the borrower's financial hardship, the use of the relevant property as a principal residence, the absence of a change in ownership, and the accuracy of the documentation submitted by the borrower.

Elsewhere, however, the Modification Agreement contains language indicating that other conditions, including the receipt by plaintiffs of a Modification Agreement executed by GMAC, must also be met.  Near the top of the second page, the Modification Agreement states:  "This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied."  In Section 2, the Modification Agreement states, under the heading "Acknowledgements and Preconditions to Modification," the following:  "I understand that the Loan Documents will not be modified unless and until (i) I receive from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) has occurred.  I further understand and agree that the Lender will not be obligated or

bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement." And, the Modification Agreement states, in Section 3: "If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 6/1/2011 (the 'Modification Effective Date') and all unpaid late charges that remain unpaid will be waived. The Loan Documents will be modified and the first modified payment will be due on 6/1/2011." Complaint Exh. 15 at 2.

Notably, in *Azimirad*, 2011 WL 1375970, at *4 n.3, Judge Chasanow observed that a cover sheet sent by the lender to the plaintiff could be interpreted as evidence that the purported condition precedent found in the agreement—in that case, the presence of a signature—was in fact merely a means of memorializing an agreement that had already come into effect. Here, the Galantes received from GMAC, along with the Modification Agreement, a cover letter dated May 16, 2011. *See* Complaint Exh. 15. The cover letter explains that the agreement "reflects the proposed terms of [the Galantes'] modified mortgage," and adds: "The approval is subject to the receipt of the signed and notarized loan modification agreement and any attachments and receipt of clear title, if applicable." *Id.* Further, beneath a heading reading "How to Accept This Offer," the cover letter identifies two steps that plaintiffs had to satisfy: (1) "COMPLETE AND RETURN THE ENCLOSED AGREEMENT BY THE DUE DATE"; and (2) "CONTINUE TO MAKE YOUR TRIAL PERIOD PAYMENTS ON TIME." *Id.* Significantly, the cover letter does not indicate that the loan modification will become effective only upon plaintiffs' subsequent receipt of a copy of the Modification Agreement signed by GMAC.

In my view, the statements found in the Modification Agreement, and the associated cover letter sent by GMAC, prevent the Court from determining at the motion to dismiss stage that, as a matter of law, no loan modification agreement came into existence.

Regarding the interpretation of the Modification Agreement's specific terms, the parties rely in part on cases outside of the District of Maryland and the Fourth Circuit.  Plaintiffs cite *Barroso v. Ocwen Loan Servicing, LLC*, 208 Cal. App. 4th 1001 (2012), which, although decided under California law, presents facts similar to those alleged here.  In *Barroso*, the plaintiff argued "that she formed a binding contract with [the defendant] to modify the terms of her mortgage and that [the defendant] waived any right to claim conditions precedent had not been satisfied by accepting modified mortgage payments for nine months." *Id.* at 1009.  Among other arguments, the defendant asserted that, because each modification plan offered to the plaintiff "included language that it would not take effect unless both [parties] signed the agreement and a fully executed copy was returned to [the plaintiff,]" no agreement to modify the plaintiff's loan was formed "because she did not allege that she received a copy of any modification agreement signed by both her and [the defendant]." *Id.* at 1012.  Notably, the defendant conceded that its failure to return executed copies of the modification to the plaintiff did not "preclude[] formation of the contract for modification."  The *Barroso* Court deemed that concession to be "appropriate," given that, in its view, "the failure to return an executed copy of the agreement in the circumstances of this case could not act as a condition precedent precluding formation of a binding modification agreement." *Id.*

In reaching that conclusion, the *Barroso* Court reasoned that the defendant's interpretation "would violate . . . fundamental principles of contract interpretation," as it would grant the defendant "sole control over the formation of the contract despite [the plaintiff's] full

performance, simply by refusing to return a signed copy to her."  208 Cal. App. 4th at 1013.[13]

Of relevance here, the plaintiff's performance included the submission for approximately five months of modified payments, which the plaintiff believed were consistent with the loan modification agreement.  *See id.* at 1005-06.  Moreover, the court reasoned that the defendant's interpretation was contrary to language found in the first paragraph of the modification agreement, which closely parallels the language found in the Galantes' Modification Agreement.  *Compare id.* at 1013 ("'If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.'") *with* Complaint Exh. 15 ("If my representations in Section 1 continue to be true in all material respects, then this Modification Agreement ('Agreement') will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.").

In the Reply, defendant cites two federal cases from Georgia that, in its view, undermine plaintiffs' interpretation of the Modification Agreement:  *Caselli v. PHH Mortg. Corp.*, 2012 WL 124027 (N.D. Ga. Jan. 13, 2012), and *Barley v. EverHome Mortg. Co.*, 2011 U.S. Dist. LEXIS 155983 (N.D. Ga. Apr. 26, 2011).  *See* Reply at 3-4.

In *Caselli*, the district court dismissed a breach of contract claim, endorsing the defendant's argument that because it "did not return a signed, executed copy of the modification to the Plaintiff," the loan modification was "not operative."  2012 WL 124027, at *5.  As the

---

[13] Specifically, the *Barroso* Court, citing California case law and a state statute, relied upon the following principles:  "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.  The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable."  208 Cal. App. 4th at 1012-13 (citations and quotation marks omitted).

district court explained, both the Home Affordable Modification's Trial Period Plan ("TPP") and the modification agreement stated that the loan modification "would not become binding unless and until the lender returned a fully executed copy of the modification to the Plaintiff." *See id.* at *1-2, 5. Because "an expressed condition of the proposed modification was never fulfilled," "the parties never mutually assented to the modification's terms," and thus no modification of the original loan terms ever occurred. *See id.* at 5. Likewise, in *Barley* the court concluded that although the plaintiff submitted a loan modification agreement, which contained language similar to the one at issue in *Caselli*, the plaintiff failed to show that the loan modification agreement was approved and mutually agreed upon by the parties. *See* 2011 U.S. Dist. LEXIS 155983, at *8; *see also, e.g.*, *Morales v. Chase Home Finance LLC*, 2011 WL 1670045, at *7 (N.D. Cal. Apr. 11, 2011) ("Plaintiffs fail to allege, however, that they have met all the conditions set forth in the TPP Contract for loan modification, including receipt of a 'fully executed copy of a Modification Agreement,' and therefore fail to allege the existence of a binding contract regarding a permanent loan modification.").

Of course, none of those cases cited by the parties involves Maryland law. Among similar cases from this District, courts typically have dismissed claims in suits involving facts that are materially different from those alleged here. For instance, in *Pratt v. BAC Home Loan Servicing, LP*, 2012 WL 1565232 (D. Md. Apr. 30 2012) (Williams, J.), a Trial Period Plan entered into by the plaintiff stated that, if "'the Servicer does not provide [the plaintiff with] a fully executed copy of this Plan and the Modification Agreement . . . or . . . the Servicer determines that [the plaintiff's] representations [regarding the plaintiff's inability to afford the mortgage payments] are no longer true and correct, *the Loan Documents will not be modified and this [TPP] will terminate.*'" *Id.* at *4 (quoting TPP; emphasis in *Pratt*). However, the plaintiff

did not receive a fully executed copy of a TPP, much less *any* copy of a permanent modification agreement. *See id.* at *2, 4.  Indeed, the district court viewed the plaintiff's claim as "essentially a claim of entitlement to a permanent loan modification under HAMP," which courts generally have rejected. *Id.* at *4.[14]

Stovall v. SunTrust Mortg., Inc.*, 2011 WL 4402680, at *2 (D. Md. Sept. 20, 2011) (Bennett, J.), also provides guidance.  That case involved a TPP agreement that contained language similar to the terms of the permanent Modification Agreement sent to the Galantes. The district court rejected the plaintiff's assertion that the TPP agreement the plaintiff received and signed constituted an offer that the plaintiff had accepted by signing. *Id.* at *11.  However, as in *Pratt*, the *Stovall* Court construed the plaintiff's claim as an improper effort to claim entitlement to a permanent loan modification, based on a purported breach of a temporary TPP agreement. *See id.* at *11-12.

At least one district court in the Fourth Circuit has declined to find a provision requiring receipt of an executed agreement from a lender to be dispositive, where a borrower never received an executed copy. *See Nash v. Green Tree Servicing, LLC*, 943 F. Supp. 2d 640, 646 (E.D. Va. 2013) (denying summary judgment to lender on breach of contract claim; although terms of modification agreement provided that, to be enforceable, borrower must receive a copy of the agreement executed by the lender, which borrower never received, borrower properly

---

[14] "Numerous courts have held that borrowers do not have an express or implied private right of action under HAMP." *Allen v. CitiMortgage, Inc.*, 2011 WL 3425665, at *4 (D. Md. Aug. 4, 2011) (Blake, J.). *See, e.g., Legore v. OneWest Bank, FSB*, 898 F. Supp. 2d 912, 917 (D. Md. 2012) ("'Congress did not create a private right of action to enforce the HAMP guidelines.'") (quoting *Allen*, 2011 WL 3425665, at *8).  "Courts in this district have held, however, that separate and apart from HAMP, enforcement of the TPP, if one exists, may give rise to a private right of action." *Legore*, 898 F. Supp. 2d at 917 (citing *Stovall v. SunTrust Mortg., Inc.*, 2011 WL 4402680, at *11 (D. Md. Sept. 20, 2011) (Bennett, J.); *Allen*, 2011 WL 3425665, at *4).

relied on lender's performance when lender began sending statements reflecting the modified amount due).

In any event, I am not persuaded that relevant case law, including authority cited by the parties, compels the dismissal of plaintiffs' breach of contract claim at this stage. Assuming the truth of plaintiffs' allegations, as I must at this juncture, plaintiffs' allegations concerning their course of dealing with GMAC after submitting the Modification Agreement strengthen their claim that they entered into a valid Modification Agreement.

As noted, plaintiffs allegedly were told by a "Mr. Cain" that GMAC had received the signed Modification Agreement from plaintiffs in late May 2011. Complaint ¶ 44. Nevertheless, in a letter of July 11, 2011, GMAC informed plaintiffs that their request for a loan modification had been denied because the "[s]igned HAMP Modification Agreement was not returned by [the] customer." Complaint Exh. 18; *see* Complaint ¶ 46. Shortly thereafter, on July 21, 2011, Ms. Galante spoke with a GMAC employee, "Marlene," who assured Ms. Galante that GMAC had "received the necessary paperwork" on time. Complaint ¶ 47. Moreover, "Marlene" advised Ms. Galante that she would "straighten out the mix-up," and told Ms. Galante that she could "disregard" the letter from GMAC dated July 11, 2011. *Id.* In light of those communications, plaintiffs allege that they continued to make mortgage payments to GMAC, consistent with the terms of the Modification Agreement, for approximately ten additional months. *Id.* ¶ 49. According to plaintiffs, they therefore "had every indication that the mix-up was resolved because they did not hear otherwise until May 25, 2012." *Id.*

In addition, statements made by Ocwen in March 2013 suggest that a permanent modification *was* approved by GMAC, but nevertheless lacked necessary approval from the bankruptcy court overseeing the Galantes' Chapter 7 bankruptcy proceedings. Specifically,

Ocwen sent plaintiffs' counsel a letter dated March 6, 2013, which stated in part, Complaint Exh. 17:

> The trial payment plan was successfully completed on May 1, 2011. A HAMP permanent modification was approved with new payments beginning June 1, 2011, in the amount of $2,593.32. Please be advised, as the account was involved in bankruptcy proceedings when the modification was approved, the permanent modification needed to be approved by the bankruptcy court in order to execute the modification.

Plaintiffs vigorously contest Ocwen's position that a lack of approval from the Chapter 7 bankruptcy court renders the Modification Agreement invalid. Opp. at 6-7. For one, they dispute the relevance of the "Authorization and Release Form for Debtor's Attorney," which is attached as Exhibit A to the defense memorandum in support of the Motion. *See* ECF 6-1. That form, which plaintiffs' bankruptcy attorney signed on March 30, 2011, indicates, among other things, that "GMACM is aware that proper court approval may be necessary to execute the workout option once approved by GMACM, and when necessary [by] the investor." *See id.* Plaintiffs assert that, because "court approval for a loan modification is not needed in a Chapter 7 case, the only feasible reason court approval would be required is that GMAC or its investor required a court order." Opp. at 6-7. Therefore, in plaintiffs' view, it was the responsibility of GMAC, and not the Galantes, to determine whether court approval was required, and to request or obtain such approval. Opp. at 7. Plaintiffs observe that GMAC's attorney entered an appearance in their bankruptcy matter on January 26, 2011, *see* Case No. 11-10671 (Bankr. D. Md.), ECF 15, and infer that "neither GMAC nor its investor required court approval since court approval was never requested." Opp. at 7.

Critically, defendant has not established how or why—particularly at the motion to dismiss stage—a lack of approval from the bankruptcy court presiding over the Galantes' Chapter 7 bankruptcy proceedings compels a finding that the Modification Agreement was

invalid as to Ocwen.  Even if it were appropriate for the Court to consider at the motion to dismiss stage the "Authorization and Release Form for Debtor's Attorney," that document sheds little light on the question of whether the approval of the bankruptcy court was necessary. Moreover, neither party has cited authority that clearly establishes, as a matter of law, whether approval from the court overseeing plaintiffs' Chapter 7 bankruptcy proceedings was required to render the Modification Agreement valid.  To the contrary, the cases on which the parties rely do not squarely address that issue.  *See In re Salpietro*, 492 B.R. 630 (Bankr. E.D.N.Y. 2013); *In re Medina*, 2012 WL 2090419 (Bankr. M.D. Fla. June 8, 2012); *In re Silva*, 2010 WL 605578 (Bankr. D. Hawaii Feb. 19, 2010).

Finally, Ocwen asserts that plaintiffs "have not and cannot plead or prove damage." Mem. at 21.  Even if a modification agreement were in place, defendant maintains, it is undisputed that plaintiffs continue to owe principal and interest on their mortgage loan.  Mem. at 22.  Accordingly, defendant argues that plaintiffs' request for $1,000,000 in compensatory damages is unwarranted.  Mem. at 22.  In the Opposition, plaintiffs assert that damages include "'payment of increased interest; longer loan payment times; higher principal balances; deterrence from seeking other remedies to address their default and/or affordable mortgage payments; damage to their credit; additional income tax liability; and costs and expenses incurred to prevent or fight foreclosure.'"  Opp. at 28.

This argument is not a ground for dismissal of the breach of contract claim.  Instead, it reflects an effort to limit plaintiffs' damages should their breach of contract claim proceed.  *See* Reply at 4 ("Even if Plaintiffs could proceed with their breach of contract claim, their request for $1 million in compensatory damages is disingenuous."); *see also* Mem. at 22 (asserting that "with or without a modification, Plaintiffs still owe the balance due on the Loan," and thus the

"request for $1,000,000.00 in compensatory damages is unsupported and extreme."). Although defendant's contentions may be relevant at a later stage, it is not apparent how these arguments compel dismissal of the breach of contract claim.

## C.  Claims sounding in fraud

Three of plaintiffs' claims against Ocwen sound in fraud: the common law fraud claim (Count VI); the Maryland Consumer Protection Act claim (Count II); and the Maryland Mortgage Fraud Protection Act claim (Count IV). As discussed, allegations of fraud implicate the heightened pleading standard under Fed. R. Civ. P. 9(b), which "'requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II*, *supra*, 660 F.3d at 353 (citation omitted). So, to establish a claim for fraud, a plaintiff must allege "'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens*, *supra*, 612 F.3d 731.

### 1.  Common law fraud

Count VI of the Complaint raises a common law fraud claim. In the Motion, Ocwen argues that plaintiffs have failed to allege the requisite elements of a fraud claim, and further maintains that the "economic loss doctrine" bars plaintiffs' fraud claim. Mem. at 17-20.

Regarding choice of law in the context of a tort claim, Maryland applies the law of the state where the alleged harm occurred ("*lex loci delicti*"). *See, e.g.*, *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010). In light of plaintiffs' residence, and the Property's location, the alleged harm would have occurred in Maryland. And, the parties cite Maryland law in connection with their arguments regarding the

fraud allegations.  *See* Mem. at 17-20; Opp. at 24-27.  Accordingly, I will apply Maryland law to plaintiffs' common law fraud claim.

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'"  *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted).  To prevail on a fraud claim in Maryland, a plaintiff must show:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 544, 921 A.2d 245, 254 (2007) (quotation marks and citation omitted); *see Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Hoffman v. Stamper*, 385 Md. 1, 16, 867 A.2d 276, 285 (2005); *Nails v. S & R*, 334 Md. 398, 415-16, 639 A.2d 660, 668-69 (1994).  At trial, a plaintiff must establish the elements of fraud "by clear and convincing evidence."  *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

To be actionable, a false representation "must be of a material fact."  *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993).  "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'"  *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted).  The "misrepresentation must be made with the deliberate intent to deceive."  *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing  *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)).  And, the defendant must "know[ ] that his representation is false" or be "recklessly

indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117, 1125 (1995).

Ordinarily, under Maryland law, a mere failure to disclose a material fact does not constitute fraud, in the absence of a legal duty to disclose that inheres in certain types of transactions. "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Maryland Envtl. Trust*, 370 Md. at 97, 803 A.2d at 516. A claim of failure to disclose "requires only that the defendant remain silent about, or omit, facts that the defendant had a duty to disclose." *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 138 n.11, 916 A.2d 257, 274 n.11 (2007).

However, "[e]ven in the absence of a duty of disclosure, one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud." *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867, 891, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215 (1985). Fraud based on active suppression of material facts is the variety of fraud referred to as "fraudulent concealment." The Maryland Court of Appeals has said: "Fraudulent Concealment 'is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed.'" *Lloyd*, 397 Md. at 138, 916 A.2d at 274 (citation omitted). In other words, it describes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact. *Id.* at 138 n.11, 916 A.2d at 274 n.11.

"'To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.'"

*Fegeas v. Sherrill*, 218 Md. 472, 476-77, 147 A.2d 223, 225-26 (1958); *accord Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 390 (2008).   As the *Rhee* Court explained, 182 Md. App. at 536, 958 A.2d at 396 (internal citation omitted) (alterations in *Rhee*):

> [T]he concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth. The gist of the action [for fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant . . . .

Where the fraudulent concealment claim is based on a duty to disclose, Maryland courts have formulated the elements of the cause of actions as follows:

> "(1) [T]he defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010) (quoting *Lloyd*, 397 Md. at 138, 916 A.2d at 274) (emphasis omitted).   *See also Frederick Road Limited Partnership v. Brown & Sturm*, 360 Md. 76, 100 n.14, 756 A.2d 963, 976 n.14 (2000) ("Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure.").

In connection with the common law fraud claim, plaintiffs raise allegations pertaining to both GMAC and Ocwen.   With respect to GMAC, plaintiffs allege, *inter alia*, that GMAC "knowingly made false representations as described above with the intent that Mr. and Mrs. Galante would act in reliance thereon," and, further, that GMAC "intended to have Mr. and Mrs. Galante make payments under the permanent loan modification creating a false state of comfort." Complaint ¶¶ 131-32.   According to plaintiffs, they "relied on the misrepresentations by not attempting to sell their home, not seeking counsel sooner, not submitting to foreclosure and not taking other protective and proactive measures to avoid foreclosure."   *Id.* ¶ 132.

GMAC is not a party to this case.  But, plaintiffs maintain that Ocwen "ratified the fraud of GMAC and further engaged in false representations of material facts that the Galantes[] are in default and owe tens of thousands of dollars in arrears, late fees, and penalties and further, by falsely representing to the Galantes that their loan modification was denied because the Galantes had not received approval from the bankruptcy court."  Complaint ¶ 135.

Regarding the contention that Ocwen can be held liable for fraudulent conduct committed by GMAC, because Ocwen subsequently "ratified" such conduct, that claim is unpersuasive.  As another judge of this Court concluded, "it is undisputable that Maryland common law rejects implied assignee liability."  *Brown v. Bank of Am., N.A.*, 2012 WL 380145, at *4 (D. Md. Feb. 3, 2012) (Williams, J.) (rejecting plaintiff's argument that, "in assuming a mortgage, Defendants became subject to" the plaintiff's fraud claims regarding actions of plaintiff's prior mortgage servicer).  Even if, in general, such a claim were viable, plaintiffs' allegations are woefully inadequate to hold Ocwen liable based on a theory of ratification of the misconduct of another.  *See Onwumbiko v. JP Morgan Chase Bank, N.A.*, 2012 WL 6019497, at *3 (D. Md. Nov. 30 2012) (Williams, J.) (dismissing fraud claim in mortgage-related suit where plaintiff sought to hold successor-in-interest liable for its predecessor's fraud), *aff'd*, 532 F. App'x 404 (4th Cir. 2013); *see also Holliday v. Holliday*, 2012 WL 1409527, at *8-9 (D. Md. Apr. 20, 2012), *aff'd*, 522 F. App'x 174 (4th Cir. 2013).

As for plaintiffs' contentions regarding Ocwen's own actions, defendant argues in part that plaintiffs have failed adequately to allege the element of reliance.  *See* Mem. at 18-19 (arguing that, "[e]ven if Plaintiffs could show that a loan modification was in place and that they were not in default on the Loan," plaintiffs have failed to allege reliance on any representation made by Ocwen).  Plaintiffs insist that they "demonstrated their reliance on OCWEN's false

representations to their detriment by filing this instant lawsuit and incurring the costs and emotional toll of litigation." Opp. at 25. However, plaintiffs' allegations indicate that they vehemently and consistently disagreed with Ocwen's position that the Modification Agreement never came into effect. *See also* Reply at 12-13. Thus, plaintiffs have failed to allege that they relied on an alleged misrepresentation. As a result, the common law fraud claim must fail. *See Coulibaly v. J.P. Morgan Chase Bank, N.A.*, 2011 WL 3476994, at *19 (D. Md. Aug. 8, 2011) (Chasanow, J.) (applying Maryland law and concluding that the plaintiff could not establish reliance element of fraud claim where "the complaint indicates that Plaintiff protested many of [Defendant]'s actions at every opportunity"), *aff'd*, 526 F. App'x 255 (4th Cir. 2013).[15]

Not every dispute between parties amounts to fraud. Plaintiffs' conclusory allegations as to fraudulent conduct by Ocwen fall well short of the heightened pleading requirements of Fed. R. Civ. P. 9(b).

### 2.  The Maryland Consumer Protection Act ("MCPA")

In Count II, plaintiffs assert that Ocwen "engaged in 'unfair or deceptive trade practices' as outlined in th[e] Complaint," in violation of the MCPA. *See* Complaint ¶ 97. Under the MCPA, a consumer may "recover for injury or loss sustained by him as the result" of an unfair or deceptive trade practice. C.L. § 13-408(a). The MCPA defines a "consumer" as "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." *Id.* § 13-101(c)(1).

"The Court of Appeals of Maryland has concluded that a consumer bringing a private action under § 13-408 must allege (1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury." *Stewart v. Bierman*, 859 F. Supp. 2d 754,

---

[15] In light of this conclusion, I need not reach defendant's alternative argument that plaintiffs' fraud claim is barred by the "economic loss doctrine." *See* Mem. at 19-20.

768 (D. Md. 2012) (citing *Lloyd*, 397 Md. at 143, 916 A.2d at 277), *aff'd sub nom Lembach v. Bierman*, 528 F. App'x 297 (4th Cir. 2013).   As plaintiffs acknowledge, *see* Opp. at 14, an MCPA claim that sounds in fraud is subject to Rule 9(b)'s heightened pleading requirement. *Spaulding*, *supra*, 714 F.3d at 781.

In C.L. § 13-303, the MCPA prohibits engaging in an unfair or deceptive trade practice in the following situations:

> (1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;
> (2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;
> (3) The offer for sale of course credit or other educational services;
> (4) The extension of consumer credit;
> (5) The collection of consumer debts; or
> (6) The purchase or offer for purchase of consumer goods or consumer realty from a consumer by a merchant whose business includes paying off consumer debt in connection with the purchase of any consumer goods or consumer realty from a consumer.

"'Consumer credit', 'consumer debts', 'consumer goods', 'consumer realty', and 'consumer services' mean, respectively, credit, debts or obligations, goods, real property, and services which are primarily for personal, household, family, or agricultural purposes."   C.L. § 13-101(d).

Among other things, any of the following constitutes an unfair or deceptive trade practice under the statute, C.L. § 13-301:

> (1) [A f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;
>
> (2) [A r]epresentation that . . . [c]onsumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

* * *

(3) Failure to state a material fact if the failure deceives or tends to deceive;

\* \* \*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods, consumer realty, or consumer service . . . .

The MCPA also establishes that, by definition, the violation of several other enumerated Maryland statutes constitutes an unfair or deceptive trade practice proscribed by the MCPA. *See* C.L. § 13-301(14) (enumerating incorporated statutes).

Defendant urges dismissal of Count II because plaintiffs "have failed to plead facts showing any reliance on alleged misrepresentations as well as any facts showing resultant damage to Plaintiffs." Mem. at 10. Plaintiffs counter that they have identified "specific instances of OCWEN's attempts to mislead" them. Opp. at 14. They cite Ocwen's claim that the loan modification was denied because GMAC never received approval from the court overseeing plaintiffs' Chapter 7 bankruptcy. Opp. at 15 (citing Complaint ¶¶ 12, 67).

According to Ocwen, even assuming that statement was false, plaintiffs "have not and cannot demonstrate reliance on the purported misrepresentation[,]" as they "made no choice and based no decision on beliefs . . . that the modification arrangement was denied because bankruptcy approval had not been given." Mem. at 10. To that end, defendant asserts that, even before Ocwen made any such statement, plaintiffs had both "staunchly contested Ocwen's right to foreclose" and argued that a loan modification agreement had been reached. Mem. at 10.

In the portion of the Opposition addressing the reliance element, plaintiffs assert: "Were it not for the misleading and deceptive statements and actions by GMAC, OCWEN and its agents, the Galantes would not necessarily have spent the monies they spent on their existing mortgage loans. These alternatives include, inter alia: refinancing their home with other lenders;

- 43 -

allowing a foreclosure; pursuing a 'short sale'; selling their home and then purchasing a different home at lower prices or renting a home."  Opp. at 16.  However, plaintiffs' claim of reliance appears to be grounded not in Ocwen's representation about the reason for the modification denial, but rather in the alleged representations by *GMAC* that the modification had been approved.  Moreover, as plaintiffs admit in the Opposition, they "had no need to pursue" the alternatives they identify, because they wanted "to remain in their existing home."  Mem. at 16.  Instead, plaintiffs explain that they "reasonably relied [on] *GMAC*'s representations that the loan modification was approved."  Mem. at 16 (emphasis added).  In other words, to the extent plaintiffs have alleged the element of reliance, that reliance was based on *GMAC*'s statements indicating that a loan modification had been approved, and *not* on any statement by Ocwen.

As with the common law fraud claim, plaintiffs have not shown how Ocwen can be held liable under the MCPA for alleged conduct perpetrated by GMAC.  *See Bezmenova v. Ocwen Financial Corp.*, 2013 WL 3863948, at *5-6 (D. Md. July 23, 2013) (misrepresentation made by defendant's predecessor-in-interest not actionable under MCPA, because "because Maryland law generally does not recognize implied assignee liability") (citing *Onwumbiko*, 2012 WL 6019497, at *3); *accord Bezmenova v. Ocwen Financial Corp.*, 2013 WL 1316445, at *3 (D. Md. Mar. 27, 2013) ("Assuming Plaintiff alleged that she relied on [a] misrepresentation [made by Defendants' predecessor-in-interest] that she would have to pay only a certain amount, the Court could not impute this misrepresentation to Defendants."); *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 565 (D. Md. 2009) (dismissing claims asserted against an assignee under MCPA because "Maryland courts have not yet extended the scope of . . . assignee liability to statutes providing for civil liability where the statute does not expressly impose this additional avenue of liability").

With respect to Ocwen's liability for its own actions, defendant argues in the Reply: "The only representation actually directly attributed to *Ocwen* is that the loan modification was denied because GMAC required bankruptcy approval prior to finalization."   Reply at 7.   According to defendant, plaintiffs "have disagreed with that representation from the moment it was relayed to them, [and] thus they cannot possibly demonstrate reliance on it."  *Id.* at 7.

"Reliance is an element for both material misrepresentation and material omission claims under the MCPA.  For material misrepresentation claims, '[a] consumer relies on a misrepresentation when the misrepresentation substantially induces the consumer's choice.'" *Bezmenova*, 2013 WL 3863948, at *5 (quoting *Bank of America, N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 533 (D. Md. 2011) (citations omitted)).  *See also Farwell v. Story*, 2010 WL 4963008, at *8-9 (D. Md. Dec. 1, 2010) (dismissing MCPA claims arising out of alleged HAMP violation where plaintiff did not allege that she relied on defendant's actions to her detriment).

In my view, plaintiffs' allegations do not articulate how they relied on any misrepresentation by *Ocwen*, the sole defendant in this action.  *See Bey v. Shapiro Brown & Alt, LLP*, --- F. Supp. 2d ----, 2014 WL 661586, at *7 (D. Md. Feb. 20, 2014) (Grimm, J.) ("Plaintiff has failed to state a claim under the MCPA because Plaintiff's Amended Complaint shows that he opposed the requests for payment made by Defendants and therefore did not rely on Defendants' representations."); *Willis v. Countrywide Home Loans Serv.*, 2009 WL 5206475, at *6 (D. Md. Dec. 23, 2009) (Blake, J.) (dismissing MCPA claim because plaintiff failed to allege reliance).  As a result, the MCPA claim must be dismissed.

### 3. The Maryland Mortgage Fraud Protection Act ("MMFPA")

In Count IV, plaintiffs allege that Ocwen violated the MMFPA, R.P. §§ 7-401 *et seq.*

According to plaintiffs, GMAC and Ocwen "committed mortgage fraud by knowingly making . . . deliberate misstatements, misrepresentation, and omissions during the mortgage lending process, with the intent that the misstatements, misrepresentations and omission be relied on by Plaintiffs[.]"  Complaint ¶ 117.

The MMFPA prohibits the commission of "mortgage fraud," R.P. § 7-402, which is defined in R.P. § 7-402(d) as:

[A]ny action by a person made with the intent to defraud that involves:

(1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(2) Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(3) Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(4) Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1), (2), or (3) of this subsection;

(5) Conspiring to violate any of the provisions of item (1), (2), (3), or (4) of this subsection; or

(6) Filing or causing to be filed in the land records in the county where a residential real property is located, any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

In turn, the "mortgage lending process" encompasses the entire "process by which a person seeks or obtains a mortgage loan," R.P. § 7-401(e)(1), including the "solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan," *id.* § 7-401(e)(2)(i), and the "notarizing of any document in connection with a mortgage loan." *Id.* § 7-401(e)(2)(ii). Among other enforcement mechanisms, the MMFPA authorizes a private right of action for damages, attorneys' fees, and treble damages. *Id.* § 7-406.

The MMFPA does not define the terms "misrepresentation" or "omission," as used in the statute. However, courts addressing MMFPA claims have indicated—and the parties agree— that in order to state a MMFPA claim, plaintiffs must plead the elements of a common law fraud claim. *See Castle v. Capital One, N.A.*, 2014 WL 176790, at *5 (D. Md. Jan. 15, 2014) (Nickerson, J.); *Ademiluyi v. PennyMac Mortg. Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502, 530 (D. Md. 2013); Mem. at 14; Opp. at 21. And, Rule 9(b)'s heightened pleading standard applies to a claim brought under the MMFPA. *White v. JPMorgan Chase Bank, N.A.*, 2013 WL 3071894, at *5 (D. Md. June 17, 2013) (Russell, J.); *Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 800 (D. Md. 2013) (Williams, J.); *Zervos v. Ocwen Loan Servicing*, 2012 WL 1107689, at *5 (D. Md. Mar. 29, 2012) (Bredar, J.).

In its Motion, defendant argues that plaintiffs fail to identify misrepresentations by Ocwen that provide a basis for an MMFPA claim. Mem. at 14. Defendant insists, *inter alia*, that any statement that the plaintiffs' loan was in default was true; that any representations as to plaintiffs' eligibility for HAMP cannot be attributed to Ocwen; and that "there is no indication that Ocwen's representation that the bankruptcy court needed to have approved the permanent loan modification prior to implementation was either 'knowing or false.'" *Id.* at 14-15. And, defendant asserts that, beyond the lack of any misrepresentation, plaintiffs have failed to plead

other elements of a fraud claim. *Id.* at 15. As defendant elaborates in the Reply, plaintiffs fail to allege how they relied on any alleged misrepresentation by Ocwen. *See* Reply at 10-11.

In my view, plaintiffs' MMFPA claim fails on the same basis as their common law fraud and MCPA claims. As defendant explains: "Because Plaintiffs—from the get go—have staunchly contested Ocwen's representations that no modification occurred and disputed the amounts that Ocwen is claiming are due pursuant to the original loan terms, Plaintiffs cannot demonstrate reliance." Reply at 10-11. Accordingly, plaintiffs' MMFPA claims will be dismissed. *See Castle*, 2014 WL 176790, at *5-6 (dismissing MMFPA claim because, *inter alia*, although plaintiff "surely pled damage," she failed to "sufficiently allege[] reliance").

## D.  The Fair Debt Collection Practices Act ("FDCPA")

In Count III, plaintiffs allege that Ocwen violated several provisions of the FDCPA. In its Motion, Ocwen insists that it is not a "debt collector" within the meaning of the FDCPA, and that, even if it does qualify as a "debt collector," plaintiffs fail to state FDCPA claims. Mem. at 11-13.

"Congress enacted the FDCPA with the goal of eliminating abusive, deceptive, and unfair debt collection practices." *Clark v. Absolute Collection Service, Inc.*, 741 F.3d 487, 490 (4th Cir. 2014) (published per curiam opinion). *See United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996) (FDCPA "protects consumers from abusive and deceptive practices by debt collectors, and protects non-abusive debt collectors from competitive disadvantage."). "To establish a FDCPA claim, a plaintiff must prove that: '(1) the plaintiff has been the object of collection activity arising from consumer debt; (2) the defendant is a debt collector as defined by the FDCPA; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA.'" *Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 333 n.3 (4th Cir. 2012)

(quoting *Ruggia v. Wash. Mut.*, 719 F. Supp. 2d 642, 647 (E.D. Va. 2010)).  *Accord Stewart*, *supra*, 859 F. Supp. 2d at 759.

1.  Whether Ocwen is a "debt collector"

Regarding defendant's claim that it does not qualify as a "debt collector," the FDCPA defines that term as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).  The term excludes, *id.* § 1692(a)(6)(F),

> any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

Accordingly, "[i]t is well-settled . . . that the 'servicer of a loan is not a "debt collector" under the FDCPA,' at least where it began servicing the loan before the borrower's default." *Minson v. CitiMortgage, Inc.*, 2013 WL 2383658, at *6 (D. Md. May 29, 2013).  *See Ademiluyi*, 929 F. Supp. 2d at 525 ("The FDCPA exempts creditors from liability because, unlike debt collectors, they 'generally are restrained by the desire to protect their good will when collecting past due accounts.'") (quoting S. Rep. No. 95–382, at 2 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1696).

Defendant insists: "If Plaintiffs' allegations are taken as true, then Plaintiffs were not in default at the time that Ocwen acquired servicing" of their loan, and thus Ocwen instead was "merely a mortgage servicer trying to collect on its own debt."  Mem. at 12.  Plaintiffs counter that a loan servicer qualifies as a "debt collector" where either (1) the debt was in default at the

time the servicer acquired it, or (2) regardless of the loan's actual status, the servicer treated the debt as if it were in default.  Opp. at 18.

In *Allen v. Bank of America Corp.*, 2011 WL 3654451, at *7 n.9 (D. Md. Aug. 18, 2011) (citations omitted), Judge Blake explained: "Typically, mortgage servicers are excluded from the statutory definition of debt collectors because at the time they begin servicing, the loans are not in default.  Where a servicer believes a loan to be in default at the time it commences servicing, however, courts have found it is not exempt from the FDCPA's definition of 'debt collector.'" *See Shugart v. Ocwen Loan Servicing, LLC*, 747 F. Supp. 2d 938, 942-43 (S.D. Ohio 2010) ("[The] exception, which may operate to remove a loan servicer from the definition of a 'debt collector', does not apply if the loan was in default at the time it was acquired by the servicing company, *or if the servicing company treated it as such*.") (emphasis added); *see also Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 539 (7th Cir. 2003) (concluding that "the exclusion in § 1692a(6)(F)(iii) does not apply because [the defendant mortgage servicer] attempted to collect on a debt that it asserted to be in default and because that asserted default existed when [the defendant] acquired the debt," even though the debt was not actually in default when the defendant acquired it).

In my view, defendant's central argument in support of dismissal—that because plaintiffs have alleged that they were not, in fact, in default, they effectively conceded that Ocwen is not a debt collector—is too clever by a half.  It is noteworthy that, approximately two weeks after acquiring its interest in the mortgage, Ocwen allegedly sent plaintiffs a Notice of Intent to Foreclose.  *See* Complaint ¶ 61; *see id.* Exh. 28.  Here, as in *Allen*, the servicer's alleged treatment of the loan as being in default at the time of the acquisition of its interest is sufficient

to qualify Ocwen as a "debt collector."   As a result, dismissal of the FDCPA claim is not required on that ground.

> ### 2.  Failure to state a claim under Rule 12(b)(6)

Defendant also argues that, even assuming it qualifies as a "debt collector" under the FDCPA, plaintiffs fail to state a claim.  Mem. at 12-13.  It observes: "All of Plaintiffs' FDCPA allegations arise out of their contention that a loan modification was reached with GMAC such that they were not in default and did not owe any back payments, late fees, or interest at the time that Ocwen acquired the Loan."   *Id.* at 13.   In defendant's view, because plaintiffs "have not shown that a loan modification agreement was ever implemented," defendant's purported misrepresentations regarding plaintiffs' obligations were actually true, and thus the FDCPA count must fail.  *Id.* at 13.  Defendant also characterizes plaintiffs' allegations as "conclusory," and insists that their claims "mimic the statutory language rather than setting forth facts explaining the alleged violations."  *Id.* at 13.

Plaintiffs have identified several specific statutory provisions as the basis of their FDCPA claim.  First, plaintiffs allege that Ocwen violated 15 U.S.C. § 1692e(2), "by sending false, deceptive, and misleading communications claiming that Plaintiffs are in default of their first mortgage (Loan No. 0601764191), that the payments they are making are not sufficient to cover the amount of their monthly payments, and requesting that Plaintiffs submit documentation to be considered for a loan modification."  Complaint ¶ 104.

Second, Ocwen is alleged to have violated 15 U.S.C. §§ 1692e(5) and 1692f(6), "by threatening to foreclose on Plaintiffs' home even though OCWEN has no present right to possession of the property under the security agreement, [through] repeated attempts to collect

non-existent past-due amounts, fees and interest on those accounts and by threatening to take other action prohibited by law."  Complaint ¶ 105.

Third, plaintiffs allege that Ocwen violated 15 U.S.C. § 1692f, "by using unfair and unconscionable means to collect the alleged debt owed by the Plaintiffs, including the collecting and attempting to collect of interest and other charges, fees and expenses not authorized by the original Loan and Modification Agreement, or otherwise legally chargeable to Plaintiffs[.]" Complaint ¶ 103.

Section 1692e of 15 U.S.C. states, in relevant part:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

* * *

(2) The false representation of--

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

* * *

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

As for § 1692f, that provision states, in part:

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section:

* * *

(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--

(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;

(B) there is no present intention to take possession of the property; or

(C) the property is exempt by law from such dispossession or disablement.

Finally, Ocwen allegedly violated 15 U.S.C. § 1692g(a)(1) "by failing to accurately and fully state in communications to the Plaintiff[s] 'the amount of the debt.'"  Complaint ¶ 106. That provision states: "Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing . . . the amount of the debt . . . ."  15 U.S.C. § 1692g(a)(1).

As indicated, Ocwen's argument for dismissal of the FDCPA claim is based heavily on its contention that no Modification Agreement came into existence.  However, as discussed, plaintiffs have plausibly alleged that they entered into a valid Modification Agreement. Accordingly, dismissal on this basis is unwarranted.  With respect to plaintiffs' allegation regarding 15 U.S.C. § 1692f, I agree that plaintiffs have done little more than parrot the statutory language; they have not alleged how defendants used allegedly "unfair or unconscionable means" in an effort to collect a debt.  *See* Complaint ¶ 103.  Nevertheless, I am persuaded that, taking as true the Complaint's factual allegations that are incorporated into Count III, plaintiffs have stated FDCPA claims with respect to the other provisions on which they rely.  Accordingly, plaintiffs' FDCPA claim may proceed with respect to 15 U.S.C. § 1692e(2), § 1692e(5), § 1692f(6), and § 1692g(a)(1).

E.  The Real Estate Settlement Practice Procedures Act ("RESPA")

In Count V, plaintiffs allege that Ocwen violated several provisions of RESPA.  Ocwen counters that the allegations "attempt to impose duties upon Ocwen above and beyond those

contained in the RESPA statute." Mem. at 15.  Additionally, Ocwen asserts that plaintiffs fail to allege facts in support of their RESPA allegations.  Mem. at 16-17.

Congress enacted RESPA in order "to insure that consumers . . . are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices . . . ." 12 U.S.C. § 2601.  Among other provisions, RESPA requires a mortgage servicer to respond to a borrower's "qualified written request" ("QWR").  *See* 12 U.S.C. § 2605(e)(1)(A), (B). A QWR consists of written correspondence from a borrower that identifies the borrower and account at issue, and "includes a statement of the reasons for the belief of the borrower . . . that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B).  At the time plaintiffs wrote the relevant letter, in 2013, a servicer had twenty days to acknowledge receipt of a QWR and sixty days to respond.  *See* 12 U.S.C. § 2605(e)(1)-(2) (2011).  However, as of January 10, 2014, servicers now have five days to acknowledge receipt and thirty days to respond.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, § 1463(c), 124 Stat. 1376, 2184 (2010) (codified at 12 U.S.C. § 2605(e)(1)-(2),(4)).

Within thirty days after receipt of a QWR, a servicer must (1) correct the error identified by the borrower and notify the borrower of such correction; or (2) investigate the matters addressed by the request, and respond to the borrower in writing, explaining "the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer," or provide the "information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer."  *Id.* § 2605(e)(2).  A servicer's

violation of this provision entitles a borrower to recover actual damages, as well as statutory damages in cases showing a "pattern or practice of noncompliance." *Id.* § 2605(f).

Under RESPA, a "servicer" is defined as "the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)." 12 U.S.C. § 2605(i)(2). "Servicing," in turn, is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts described in section 2609 of this title, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." *Id.* § 2605(i)(3).

Plaintiffs allege that on February 14, 2013, they sent through their counsel a letter that constituted a QWR, as defined under RESPA. Complaint ¶ 121. According to plaintiffs, Ocwen violated RESPA, 12 U.S.C. § 2605(e)(2)(A), "by failing to make appropriate corrections to Plaintiffs' account in response to the qualified written request, including the crediting of any late charges or penalties, and failing to transmit written notice of such corrections to the Plaintiff no later than 60 days after receipt of the Plaintiffs qualified written request." Complaint ¶ 122. In defendant's view, plaintiffs do not state a RESPA claim because they have not alleged that Ocwen failed to investigate or respond to plaintiffs' claims. *See* Mem. at 16. Indeed, investigating and providing an appropriate response can qualify as an adequate response under § 2605(e)(2).

Defendant maintains, and I agree, that plaintiffs have attempted to create a RESPA claim due to their dissatisfaction with Ocwen's response to their query. *See id.* The same is true of plaintiffs' similar contention, that Ocwen violated RESPA, 12 U.S.C. § 2605(e)(2), "by refusing to cease its collection efforts and foreclosure proceedings after receiving the Plaintiffs[?] qualified

written request."  Complaint ¶ 123.  Simply put, plaintiffs have not identified any failure to comply with 12 U.S.C. § 2605(e)(2) on the part of Ocwen.

Further, plaintiffs assert that, "[u]pon information and belief," Ocwen violated 12 U.S.C. § 2605(e)(3) "by providing information to consumer reporting agencies regarding overdue payments allegedly owed by Plaintiffs that were related to the qualified written request." Complaint ¶ 124.  Defendant argues—correctly, in my view—that this allegation is conclusory, as it merely parrots the statutory language, without providing factual allegations in support of the claim.  *See, e.g.*, *Guidi v. Paul Financial, LLC*, 2014 WL 60253, at *6 (N.D. Cal. Jan. 7, 2014) (dismissing § 2605(e)(3) claim because plaintiffs "fail to identify in any meaningful, or even cursory, fashion when such reporting occurred, to which agencies the reporting was made, or whether information regarding any overdue payment was included in such a report"); *see also, e.g.*, *Menashe v. Bank of New York*, 850 F. Supp. 2d 1120, 1133 (D. Hawaii 2012); *Urbano v. Bank of Am., N.A.*, 2012 WL 2934154, at *11 (E.D. Cal. July 18, 2012).

Plaintiffs also allege that Ocwen "engaged in a pattern or practice of non-compliance with the requirements of the mortgage servicer provisions of RESPA as set forth in 12 U.S.C. § 2605."  Complaint ¶ 125.  According to defendant, because plaintiffs "complain of a single QWR that they sent to Ocwen and Ocwen's singular response," they fail to identify any actionable "pattern or practice," because "[n]o pattern or practice can be drawn from a one-time occurrence."  Mem. at 17.  I agree that plaintiffs have not adequately alleged any "pattern or practice" on Ocwen's part.  Therefore, that aspect of Count V also fails.  *See, e.g.*, *Engler v. ReconTrust Co.*, 2013 WL 6815013, at *7 (C.D. Cal. Dec. 20, 2013) ("Plaintiff has not alleged there is a pattern or practice of noncompliance. Indeed, he only alleges a single RESPA violation."); *McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079, 1096 (W.D. Wash. Mar.

7, 2013) (no "pattern or practice of violating § 2605(e)(3)" where plaintiff identified "only a single wrong: the failure to treat plaintiff's letter as a QWR"); *Echeverria v. BAC Home Loans Servicing, LP*, 900 F. Supp. 2d 1299, 1307 (M.D. Fla. 2012) ("a single RESPA violation is not evidence of a 'pattern or practice' of violations").

## F.  Declaratory and injunctive relief (Count I)

In Count I, plaintiffs seek declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201-2202 and Md. Code (2013 Repl. Vol.) §§ 3-401 through 3-415 of the Courts & Judicial Proceedings Article ("C.J.").  *See* Complaint ¶¶ 82-90.  Turning first to the declaratory judgment claim, plaintiffs request "a declaration of their rights with respect to the status of their mortgage modification and their accounts with Ocwen."  *Id.* ¶ 84. *See also id.* at 18 (specifying relief requested in connection with Count I).[16]

"[T]he granting of declaratory relief is entrusted to the discretion of the district court." *Great Am. Ins. Co. v. Gross*, 468 F.3d 199, 209 (4th Cir. 2006) (citing 28 U.S.C. § 2201 ("any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration") (emphasis added)).  "'In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.'"  *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 257 (4th Cir. 1996) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)).

---

[16] In the Complaint and the briefing addressing defendant's Motion, no party argues that different standards apply under 28 U.S.C. §§ 2201-2202 and C.J. §§ 3-401 through 3-415. Notably, plaintiffs have cited no authority establishing that they may pursue in federal court a declaratory judgment under C.J. §§ 3-401 through 3-415.  In any event, because defendant raises no independent argument for dismissal of the declaratory judgment claim under C.J. §§ 3-401 through 3-415, the analysis here does not differentiate between the two bases for the declaratory relief sought by plaintiffs.

Plaintiffs assert: "An actual controversy exists as to the true amount owed by Plaintiffs to Defendant and the correct amount of their monthly payments under the terms of the modified mortgage agreement." Complaint ¶ 86. Defendant disagrees, essentially on the ground that the Modification Agreement never went into effect. *See* Mem. at 8; Reply at 5. However, as indicated, plaintiffs' breach of contract claim relating to the Modification Agreement survives dismissal. Accordingly, dismissal of the declaratory judgment claim is unwarranted at this time. *See Allen v. CitiMortgage, Inc.*, 2011 WL 3425665, at *11 (D. Md. Aug. 4, 2011) (in suit pertaining to an alleged mortgage modification, declining to dismiss declaratory judgment claim where plaintiff's breach of contract claim and other claims survived defendant's motion to dismiss).[17]

With respect to the injunctive relief sought by plaintiffs, the Complaint seeks to bar Ocwen "from executing a foreclosure until a decision on the merits has been made in this case as to whether OCWEN is contractually or otherwise obligated to abide by the terms of the permanent loan modification." Complaint ¶ 85. Notably, plaintiffs did not file a motion seeking a preliminary injunction. On the eleventh page of their Opposition, however, plaintiffs indicate that they "seek a preliminary injunction enjoining any foreclosure proceeding." Opp. at 11.

As the Fourth Circuit observed in *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013), a preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." (Quotation marks and citation omitted.) The movant may obtain such extraordinary relief only on a clear showing of entitlement. *Mazurek v. Armstrong*, 520 U.S.

---

[17] To the extent plaintiffs seek declaratory judgment at this stage of the case, before a decision on the merits, *see* Complaint ¶ 85, that request is denied. As discussed, *infra*, plaintiffs have not established that a preliminary injunction is warranted. Moreover, they have cited no authority suggesting that declaratory relief would be appropriate at this stage of the litigation.

968, 972 (1997) (per curiam).  Notably, a preliminary injunction is not appropriate "simply to prevent the possibility of some remote future injury."  11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2948.1 (2d ed. 1995), at 154-55.

In order to obtain a preliminary injunction under Rule 65(a), the movant must satisfy all four factors articulated by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008): (1) that the movant is "likely to succeed on the merits," (2) that the movant is "likely to suffer irreparable harm in the absence of preliminary relief," (3) that the "balance of equities tips in [the movant's] favor," and (4) that "an injunction is in the public interest."  *Accord Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, *The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010) (per curiam); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

In the Opposition, plaintiffs provide brief arguments under the *Winter* factors, asserting (1) that plaintiffs are likely to prevail on the merits; (2) that a foreclosure sale would cause irreparable harm; (3) that the balance of equities weighs in plaintiffs' favor, because "the loss of their property would render the judgment in this litigation ineffectual" in light of the "irreparable injury" plaintiffs face, while "OCWEN would suffer no undue hardship if the court enjoined it from proceeding with a foreclosure sale pending resolution of this case"; and (4) that "[t]he public interest is to keep homeowners who pay their mortgages in their homes and to prohibit mortgage servicers from wrongfully foreclosing on properties when the homeowner, such as in this case, provided all of the requested paperwork and made all of the necessary payments."

As noted, plaintiffs have not filed a motion seeking a preliminary injunction.  In my view, a preliminary injunction is unwarranted based on plaintiffs' allegations and arguments in the Opposition.   Accordingly, plaintiffs' request for a preliminary injunction, found in the Opposition, is denied, without prejudice.  If plaintiffs wish to pursue a preliminary injunction at this stage, they are directed to do so through a motion, and in compliance with, *inter alia*, the provisions of Fed. R. Civ. P. 65.

## G.  Punitive damages

Defendant also argues that plaintiffs' request for punitive damages must be stricken. Mem. at 22-23.  In the Opposition, plaintiffs cite no case, statute, or rule in support of their assertion that punitive damages are warranted.  *See* Opp. at 28-29.  Rather, plaintiffs rely on factually-based assertions regarding defendant's alleged conduct.

Generally, under Maryland law, punitive damages may only be awarded in cases where the plaintiff alleges that the defendant acted with "actual malice"—*i.e.*, "evil motive, intent to injure, ill will or fraud."  *Scott v. Jenkins*, 345 Md. 21, 29-30, 690 A.2d 1000, 1003-04 (1997); *see also Dow v. Jones*, 232 F. Supp. 2d 491, 496 (D. Md. 2007).  The actual malice standard poses a high bar that requires pleading to "'a high degree of specificity.'"  *Dow*, 232 F. Supp. 2d at 496 (quoting *Scott*, 345 Md. at 36, 690 A.2d at 1007).  Moreover, "where actual malice is shown, punitive damages may be awarded in a tort action but not in an action for breach of contract."  *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 545, 515 A.2d 756, 765 (1986).  Plaintiffs plainly fail to allege facts demonstrating "actual malice" on Ocwen's part.

The only other surviving claim entitling plaintiffs to a potential recovery of damages is brought under the FDCPA.  But, "[p]unitive damages are not available under the FDCPA." *Kennedy v. Hankey Group*, 2010 WL 1664087, at *5 n.23 (D. Md. Apr. 22, 2010) (citing *Thomas*

*v. Law Firm of Simpson & Cybak*, 244 F. App'x 741, 743 (7th Cir. 2007)); *see also, e.g.*,

*Varnado v. Midland Funding LLC*, --- F. Supp. 2d ----, 2014 WL 1994622, at *6 (N.D. Cal. May

15, 2014) (collecting cases); *Hamid v. Stock & Grimes, LLP*, 876 F. Supp. 2d 500, 502 (E.D. Pa.

2012).  Accordingly, plaintiffs' request for punitive damages will be stricken.[18]

## H.  Leave to amend

Defendant seeks dismissal of all claims, with prejudice.  Mem. at 23; Reply at 13.  The

only remaining question is whether plaintiffs should be granted leave to amend the Complaint,

which they request in the Opposition.  *See* Opp. at 29 ("Plaintiffs further request they be allowed

to amend their Complaint pursuant to any ruling as may be issued by the Court pursuant to

OCWEN's Motion to Dismiss.").  *See also* Fed. R. Civ. P. 15(a)(2).

Denial of leave to amend is appropriate where "'the amendment would be prejudicial to

the opposing party, there has been bad faith on the part of the moving party, or the amendment

would be futile.'"  *Edwards*, *supra*, 178 F.3d at 242 (quoting *Johnson v. Oroweat Foods Co.*,

785 F.2d 503, 509 (4th Cir. 1986)).  *See Anand*, *supra*, 2014 WL 2535405, at *4; *Balas v.

Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 409 (4th Cir. 2013); *Green v. Wells Fargo

Bank, N.A.*, 927 F. Supp. 2d 244, 257 (D. Md. 2013).

As indicated, plaintiffs fail to state claims under the MCPA (Count II), the MMFPA

(Count IV), and RESPA (Count V).  Nor have they stated a claim for common law fraud (Count

---

[18] The Complaint's introductory paragraph also makes reference to "Gross Negligence" and "Negligent misrepresentation."  *See id.* at 2.  However, there is no count dedicated to either a gross negligence or a negligent misrepresentation claim, and indeed, neither "negligent" nor "negligence" appear in connection with any other count of the Complaint.  Beyond the introductory paragraph, negligence is referenced only once, in the context of an argument regarding purported efforts to inflate late fees and penalties owed by plaintiffs.  *See* Complaint ¶ 72.  In the Motion, defendant observes, accurately, that although plaintiffs "allude to cause[s] of action for 'Gross Negligence' and 'Negligent misrepresentation,'" they "do not elaborate on such causes of action or plead facts in support of negligence causes of action."  *See* Mem. at 5 n.1.  Plaintiffs do not challenge that characterization in the Opposition.

VI).  In connection with the MCPA, MMFPA, and fraud claims, plaintiffs fail plausibly to allege that they relied on any misrepresentation by Ocwen.  To the contrary, plaintiffs disputed Ocwen's assertions regarding their mortgage and the status of the alleged modification. Moreover, the MCPA, MMFPA, and fraud claims are based partially on conduct of GMAC, which is not a defendant, and plaintiffs have failed to establish how Ocwen can be held responsible for GMAC's acts based on conclusory assertions that Ocwen ratified GMAC's conduct.  Regarding the RESPA claim, plaintiffs' allegations fall well short of stating an actionable claim.  Among other deficiencies, plaintiffs' allegations attempt, in part, to impose duties on Ocwen that go beyond RESPA's actual requirements.  And, based on the counts that survive dismissal, it appears that any effort to state a claim for punitive damages would prove to be futile.  Under these circumstances, an opportunity to amend the Complaint is unwarranted.

## IV.  Conclusion

For the foregoing reasons, defendant's Motion (ECF 5) will be granted in part and denied in part.  A separate Order follows, consistent with this Memorandum Opinion.


Date:   July 18, 2014                    _____/s/_____
                                         Ellen Lipton Hollander
                                         United States District Judge