**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **JOHN T. GALANTE, et al.** ) | **CASE NO. 1:13-cv-1939-ELH** |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| **v.** ) | |
| ) | |
| **OCWEN LOAN SERVICING, LLC,** ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT & REQUEST FOR TRIAL BY JURY

**COME NOW PLAINTIFFS**, John T. Galante and Denise S. Galante, ("The Galantes") by Sari K. Kurland, their attorney, and hereby file this Complaint against OCWEN Loan Servicing, LLC, for Declaratory and Injunctive Relief, (Count I),violation of Fair Debt Collection Practices Act ("FDCPA") (Count II), Violation Maryland Consumer Debt Collection ("MCDC"), (Count III Violation of the Maryland Consumer Protection Act ("MCPA"), (Count VI), and Breach of Contract, Count V, and state as follows:

### JURSIDICTION AND VENUE

1. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

2. Venue in this District is proper in that the Defendant transacts business in Maryland and the conduct complained of occurred in Maryland.

3. The jurisdiction of this Court is founded on diversity of jurisdiction pursuant to 28 U.S.C. §1332 as OCWEN maintains its chief Executive offices and principal place of business in West Palm Beach Florida and the amount in controversy, including the value of the injunctive relief requested, exclusive of interests and costs exceeds $75,000.00.

4. Jurisdiction lies within the District of Maryland because OCWEN has minimum contacts with Maryland and otherwise intentionally avails itself of Maryland markets, so as to render the exercise e of jurisdiction by the Maryland courts permissible under traditional notions of fair play and substantial justice.

5. This Court has jurisdiction over the Plaintiffs' state law claim because it is so related to their federal claims that it forms part of the same case or controversy under Article III, Section 2 of the United States Constitution.

6. Venue is proper in the United States District Court for the District of Maryland under 28 U.S.C. § 1391 because the incidents, events, or omissions complained of and giving rise to the instant claim or controversy occurred within the District.

## PARTIES

7. Plaintiffs John T. Galante and Denise S. Galante ("Plaintiffs" or "Galantes") are residents of the State of Maryland and owners of the real property located at 6077 Welch Avenue, Deale, Maryland 20751. ("The Property").

8. Defendant OCWEN LOAN SERVICING, LLC ("OCWEN") is a provider of mortgage loan servicing services.  OCWEN is headquartered in Dunwoody, Georgia, with additional offices in West Palm Beach, Orlando, Florida, Houston, Texas, St. Croix, the U.S. Virgin Islands and regularly conducts business in the State of Maryland.

## FACTS COMMON TO ALL COUNTS

9. Defendant OCWEN is a business that collects upon residential mortgage loan debt.

10. The Galantes purchased their family home in Deale, Maryland in 2005. They refinanced their loan on February 14, 2007 with Citywide Mortgage Corporation. The loan was transferred to GMAC Mortgage on February 28, 2007, and an interest in the note and mortgage is alleged to have been acquired by OCWEN on February 16, 2013. A true copy of the 2007 Note and 2007 Deed of Trust is attached as Exhibit 1 and Exhibit 2 respectively.

11. Defendant OCWEN obtained its interest in the note and mortgage after the Plaintiffs' alleged default.

12. In May 2011, the Galantes entered into a permanent loan modification agreement with GMAC. GMAC and now OCWEN dispute that the permanent modification signed by all parties is an enforceable agreement. GMAC initially claimed the loan modification was denied because it [GMAC] had not received the signed loaned modification agreement from Plaintiffs. Later on, GMAC claimed that the loan modification was denied because the Galantes had filed for Bankruptcy. OCWEN now claims the loan modification was denied because GMAC did not receive approval from the bankruptcy court. These false, misleading and often contradictory statements were deliberately made to either foreclose on their home and/or collect on any insurance it may have or attempt to force the Galantes reapply for a loan modification allowing OCWEN to tack on penalties and late fees.

13. OCWEN was made fully aware of GMAC's wrongful conduct. The Galantes sent letters to OCWEN dated February 14, 2013, March 1, 2013 and May 3, 2013 requesting that OCWEN honor the permanent modification agreement. Instead of ceasing the wrongful threats and foreclosure activities or investigating the matter in a reasonable and prudent manner as it is obligated, OCWEN refused and referred the Galantes account to the office of Samuel I. White, P.C., to commence foreclosure.

14. To date, OCWEN continues GMAC's wrongful conduct with full knowledge that a valid fully executed modification agreement exists, thereby ratifying GMAC'S wrongful conduct. Therefore, Defendant OCWEN is subject to all claims that Plaintiffs could bring against GMAC which arise from GMAC's conduct as alleged herein, all of which was known to OCWEN at the time it undertook servicing of Plaintiffs' loan.

## *Brief History of Home Affordable Modification Program ("HAMP")*

15. Beginning in the fall of 2008, the federal government instituted several measures to try to stabilize the housing and credit markets and assist troubled homeowners.

16. In March 2009, the United States launched The Making Home Affordable (MHA) Program. The MHA Program included the Home Affordable Modification Program (HAMP), a Treasury program that uses TARP funds to provide incentives for mortgage servicers to modify eligible first-lien mortgages.

17. HAMP uses incentive payments to encourage loan servicers and owners of mortgage loans or bonds backed by mortgage loans to modify eligible first lien mortgages so that monthly payments of homeowners who are in default or at imminent risk of default will be reduced to affordable and sustainable levels.

18. In October 2008, Ally Financial/GMAC accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. §5211. Six months later Ally Financial/GMAC signed a contract with the U.S. Treasury agreeing to participate in HAMP.

19. OCWEN received federal funds of over $600 million dollars through the Treasury Department in order to facilitate participation in the Making Home Affordable Modification Program.

20. GMAC and OCWEN are loan servicers who entered into agreements with the federal government in which they agreed to comply with HAMP and provide qualifying borrowers with permanent modifications.

## *Galantes Request for Assistance under HAMP*

21. Mr. and Mrs. Galante have been married for 25 years and raised four daughters together.

22. Mrs. Galante has worked for the state of Maryland since 1998 and Arlington Heating since 1987.

23. Mr. Galante worked at Grabber Construction for over 24 years before the market crash in 2008, and as a result of the collapse of the housing industry, his income was reduced by 55%. Consequently, the Galantes depleted their life savings to stay current on their mortgage and other bills.

24. In November 2010, Plaintiffs contacted GMAC and inquired about restructuring their mortgage to obtain lower monthly payments. They were informed that they were ineligible for HAMP because they were current on their mortgage payments. The Galantes were advised by a GMAC representative to miss three mortgage payments before contacting them again for help.

25. On December 2, 2010, GMAC sent a letter to the Galantes stating that they were 30 days or more past due on their loan and the amount due was $8,499.33. The letter advised the Galantes to contact GMAC if they were experiencing financial difficulties because they offered a number of programs that may help bring their account current. A copy of the 12/2/10 letter is attached as Exhibit 3.

26. In a letter dated December 13, 2010, GMAC stated the Galantes were in default and the amount past due was $7,774.62 for the months of November and December 2010. A copy of the 12/13/10 letter is attached as Exhibit 4.

27. The Galantes contacted GMAC again to discuss the possibility of having their mortgage modified. During that conversation, the GMAC representative told the Galantes that if they submitted a modification application, they [GMAC] would process their application under HAMP.

28. The Galantes applied for a HAMP mortgage modification on or about December 14, 2010, in support of their application, Plaintiffs sent GMAC a package containing all requested financial information and documents, including a Hardship Affidavit. Despite having provided all of the requested information, Plaintiffs received a letter from GMAC, dated December 17, 2010, stating that they had not provided documents required to support their financial hardship. A copy of the 12/17/10 letter is attached as Exhibit 5.

29. On December 22, 2010, Plaintiffs resubmitted the requested documents to GMAC's loss mitigation department. The Galantes also informed GMAC that they were filing for Bankruptcy and provided them with their Bankruptcy attorney's contact information. A copy of the 12/22/10 facsimile cover sheet from the Galantes to GMAC is attached as Exhibit 6.

30. GMAC sent the Galantes a letter dated December 23, 2010, thanking them for their inquiry regarding their account and claiming that they were processing their request and would respond within 20 business days. A copy of the 12/23/10 letter is attached as Exhibit 7.

31. Plaintiffs filed a Voluntary Petition for Order for Relief under Chapter 7 in the U.S. Bankruptcy Court on January 12, 2011. (MD BK Case 11-10671 Doc. No. 1).

32. Plaintiffs filed their "Statement of Intention" with the Bankruptcy Court on January 12, 2011, indicating their intent to retain their home and continue making payments on the Property. A copy of the Statement of Intent ¶ 2 is attached as Exhibit 8.

33. GMAC did not file an objection to discharge, adversary proceeding, or request relief from the automatic stay.

34. Subsequent to their Chapter 7 filing GMAC began working with the Galantes to obtain a loan modification for their first mortgage.

35. The loan modification trial period began February 2011, (*a month after they filed bankruptcy*) and the Galantes' mortgage payment was reduced from $3,901.00 to $2,593.32.

36. Plaintiffs made their first trial period mortgage payment on February 4, 2011, for loan (No. 0601764191). The Galantes continued making their regular monthly payment for their second mortgage[1] (No. 8601816305). A copy of the Galantes' bank statements showing all monthly mortgage payments made to GMAC is attached as Exhibit 9.

37. GMAC continued to accept the agreed reduced mortgage payments each and every month until February 2013, when the servicing rights were acquired by OCWEN.

---

[1] Plaintiffs' second mortgage is not subject to this Complaint.

38. On March 21, 2011, Plaintiffs received a letter from GMAC stating in pertinent part: "*As a result of your recent approval for a loan modification and to comply with federal laws and regulation, we are required to notify you that your property is located in a Special Flood Hazard Area.*" This letter further demonstrates that the loan modification was approved by GMAC. A copy of the 3/21/11 letter is attached as Exhibit 10.

39. Plaintiffs then received a letter from GMAC Mortgage dated May 2, 2011, advising the Galantes that they successfully completed the trial period of the loan workout plan and that their account would be processed for a permanent modification. A copy of the 5/2/11 letter is attached as Exhibit 11.

40. Plaintiffs received another letter from GMAC dated May 10, 2011, stating that they completed the trial modification and were approved for a permanent modification. A copy of the 5/10/11 letter is attached as Exhibit 12.

41. In a letter dated May 16, 2011, GMAC Mortgage congratulated Plaintiffs on their eligibility for a Home Affordable Modification, stating: "All required documents have been received." A copy of the 5/16/11 letter is attached as Exhibit 13.

42. On the same day, Plaintiffs faxed the document verifying that they had no criminal records. Facsimile dated 05/16/11 is attached as Exhibit 14, page 2.

43. Plaintiffs also executed and returned the loan modification agreement on May 24, 2011. The modification agreement was signed "acknowledged by lender" by an authorized officer on May 27, 2011. See fully executed modification agreement attached as Exhibit 15.

44. Mr. Cain, a GMAC employee, (ID No. 22311) confirmed receipt of the signed agreement at the end of May 2011.

45. Despite having received a letter stating that "all required documents have been received." pertaining to loan No. 0601764191, the Galantes received a letter from GMAC dated May 25, 2011 stating that they were unable to finalize the loan modification without all of the required documentation. Letter dated 05/25/11 attached as Exhibit 16.

46. In a letter dated July 11, 2011, GMAC falsely claimed and deliberately deceived the Galantes by stating that the Galantes' request for a loan modification was denied because a "signed HAMP Modification Agreement was not returned".[2] Letter dated 07/11/11 attached as Exhibit 18.

47. On July 21, 2011, Mrs. Galante called GMAC and spoke with a GMAC employee named Marlene. Marlene informed Mrs. Galante that GMAC received the necessary paperwork timely and she [Marlene] would straighten out the mix-up and told Mrs. Galante to disregard GMAC's letter dated July 11, 2011.

48. On May 15, 2012, Plaintiffs received their Final Decree from the United States Bankruptcy Court for the District of Maryland closing their Chapter 7 Bankruptcy case. See Final Decree from Bankruptcy Court attached as Exhibit 19.

49. The Galantes continued making their mortgage payments and had every indication that the mix-up was resolved because they did not hear otherwise until May 25, 2012, (more than ten months later). In a letter dated May 25, 2012 GMAC falsely claimed that they had not received mortgage payments from October 1, 2011 through May 1, 2012. See default letter dated 5/25/12 attached as Exhibit 20.

---

[2] In a letter dated March 6, 2013, OCWEN admitted that GMAC received the signed loan modification on June 1, 2011. The Ocwen letter date 03/06/13 attached as Exhibit 17, page 2 ¶1. This directly contradicts GMAC's letter dated 07/11/11 which stated that the loan modification was denied because the modification agreement had not been returned.

50. The Galantes received another notice dated July 2, 2012 that stated the date of default on their loan was October 2, 2011. See notice dated 07/02/12 attached as Exhibit 21.

51. On Friday, August 10, 2012 Mrs. Galante called GMAC and spoke with a GMAC employee named Fredrick. Mrs. Galante requested that a copy of the signed loan modification agreement be sent to them. Although Frederick acknowledged receipt of the signed loan modification agreement, he advised her that he was unable to send a copy[3]. Frederick proceeded to inform Mrs. Galante in a rude and disrespectful manner that the Galantes would have to begin the loan modification process all over again or GMAC would begin foreclosure proceedings.

52. Mrs. Galante explained that they returned their signed agreement and all other necessary documentation and made every mortgage payment since the loan modification was approved. Mrs. Galante went on to explain that Mr. Cain, a GMAC employee, had previously verified that the Galantes did everything required to provide the necessary documents and make all of the required mortgage payments.

53. Frederick stated that it did not matter what they [the Galantes] did previously. He reiterated that they would have to start the process over again or GMAC would foreclose on their home. Frederick stated that even if it was GMAC's error in handling the Galantes' paperwork, it was too late to go back and fix it.

54. In another letter dated September 5, 2012, GMAC stated that they did not receive mortgage payments for the months of December 1, 2011 through September 1, 2012 and the Galantes account was in default. GMAC made a demand for $41,034.35 to bring the account current. Letter dated 09/05/12 attached as Exhibit 22.

---

[3] A copy of the executed modification agreement was eventually sent by OCWEN at Plaintiffs' request.

55. In a letter dated September 6, 2012, GMAC stated that they had recently received their loan modification request but could not fulfill their request at this time because they had not received additional requested information. Letter dated 09/06/12 is attached as Exhibit 23.

56. In a notice dated October 18, 2012 GMAC sent claimed that the Galantes' mortgage payments were past due and that their property may be referred to foreclosure after 14 days from the date of the letter. Notice dated 10/18/12 attached as Exhibit 24.

57. In a letter dated December 3, 2012 GMAC falsely stated that they had not received mortgage payments for the months of January, 1, 2012 through December 1, 2012. (*The dates differ from the Notice sent May 25, 2012 where GMAC claimed they had not received mortgage payments from December 1, 2011 through September 1, 2012. See Exhibit 23*).The letter further stated that the Galantes were now $48,171.90 in arrears. Letter dated 12/03/12 attached as Exhibit 25.

58. On January 10, 2013 a stranger, which the Galantes later on learned was a GMAC inspector, trespassed on the Galantes' property and started taking photographs. The Galantes were in a panic believing that the foreclosure sale of their property was imminent.

59. In a letter dated January 23, 2013, GMAC stated that they had not received mortgage payments for the months of February 2012 through January 2013. The letter further states that the Galantes are now $50,325.98 in arrears. Letter dated 01/23/13 is attached as Exhibit 26.

60. On February 7, 2013, GMAC sent a letter to the Galantes advising them that the servicing of their mortgage loan was transferring to OCWEN. Letter dated 2/7/13 attached as Exhibit 27.

61. In a letter dated February 28, 2013, OCWEN sent a Notice of Intent to Foreclose. Notice attached as Exhibit 28.

62. In March 2013 OCWEN refused and returned Plaintiffs' mortgage payment for the first time. All returned mortgage payments have been deposited into a trust account.

63. On March 6, 2013, OCWEN sent a letter threatening to foreclose on the Galantes' Property. Letter dated 03/06/13 attached as Exhibit 29.

64. In a Mortgage Account Statement dated March 18, 2013 OCWEN states that the Galantes owe $54,782.58 in back payments, $3,766.56 in late charges, $2,593.32 in other charges. Statement dated 03/18/13 attached as Exhibit 30.

65. To date, Plaintiffs have made or attempted to make all required payments pursuant to the loan modification agreement entered into with GMAC in February of 2011.

66. Plaintiffs sent OCWEN several letters giving it an opportunity to rectify its wrongful collection actions and threats.

67. OCWEN responded with misinformation asserting the loan modification was denied because GMAC required but never received Bankruptcy Court approval. This alleged position was never previously disclosed by GMAC.

## *OCWEN AND GMAC'S MISCONDUCT AND OCWEN'S RATIFICATION OF GMAC'S MISCONDUCT*

68. Under consumer protection laws, Defendants are prohibited from engaging in unfair or deceptive practices with respect to consumers.

69. OCWEN regularly conducts or manages loan modifications on behalf of the entities that hold the loans and mortgages.

70. In the course of its conduct, management and oversight of loan modifications OCWEN engaged in a pattern of unfair and deceptive practices.

71. GMAC engaged in a pattern of unfair and deceptive practices, including, but not limited to, the following:

    a.   failing to perform proper loan modification underwriting;

    b.   failing to gather or losing loan modification application documentation and other paperwork;

    c.   failing to adequately train staff responsible for loan modifications;

    d.   failing to establish adequate processes for loan modifications;

    e.   wrongfully denying the Galantes' modification application;

    f.   providing false or misleading information to the Galantes while threatening to schedule and conduct a foreclosure sale despite the fact that the Galantes paid their mortgage every month during the loan application process; during the trial loan modification periods; and since their loan modification approval;

    g.   failing to provide accurate and timely information to the Galantes who are in need of, and eligible for, loss mitigation services, including loan modification;

    h.   falsely advising the Galantes that they must be at least 90 days delinquent in mortgage payments to qualify for a loan modification;

    i.   failing to properly process the Galantes' application for a loan modification, including failing to account for documents submitted by them and failing to respond to the Galantes' reasonable requests for information and assistance; misleading the Galantes by providing false or deceptive reasons for denial of their loan modification.

72. Late fees and penalties are a huge revenue source for servicers. The mortgage servicer benefits from late fees and penalties, not principal and interest payments. Therefore, the servicer has a financial motive to artificially inflate late fees and penalties. Approval of the loan modification would largely reduce servicer revenue. The Galantes believe and allege that GMAC and OCWEN strung them along in order to inflate late fees and penalties so that OCWEN can then recover more money from the proceeds of a foreclosure sale. At best, GMAC was grossly negligent; at worst GMAC then and OCWEN now, systematically lied to the Galantes by lulling them into a false sense of security.

73. OCWEN knew of GMAC's pattern of misconduct but proceeded with its wrongful conduct as alleged herein despite its knowledge of history of this case.

74. The Galantes' relied upon the existence of the modification agreement and performed under it to their detriment. By its actions, GMAC consented to and acquiesced in the modification agreement, has waived any rights to and is estopped from seeking enforcement of the original note terms.

75. Based on the above information, Mr. and Mrs. Galante believe and therefore allege that GMAC did not intend to keep its promises – to properly process requests for payment assistance under HAMP if they submitted a HAMP application – at the time GMAC made the April 2010 promise and similar promises outlined in this complaint. The false promises, therefore, were misrepresentations of material facts. This information was known by or made available to OCWEN and OCWEN has chosen to proceed despite its knowledge of GMAC's intent, therefore ratifying GMAC's actions.

76. As of the filing of this Complaint, OCWEN has still failed to honor the modification agreement and instead continues to threaten to begin foreclosure proceedings.

## *SUMMARY OF DAMAGES AND INJURIES SUFFERED BY PLAINTIFFS*

77. Defendant's wrongful actions and practices alleged herein caused Plaintiffs damages, injuries, and losses of money in the following respects, among others:

A. Plaintiffs were induced to make temporary trial and modified mortgage payments and then modified mortgage payments since February 2011.

B. Plaintiffs forewent other productive remedies that they might have pursued or other strategies to deal with their financial distress and/or mortgage loan defaults. Had they pursued such alternative remedies or strategies, rather than proceed toward a loan modification in reliance on GMAC's representations, Plaintiffs would not necessarily have spent the monies that they spent on their existing mortgage loans. These alternatives include, inter alia: refinancing their homes with other lenders; allowing a foreclosure; pursuing a "short sale"; selling their home and then purchasing a different home at lower prices or renting a home. Plaintiffs had no need to pursue these other remedies and strategies; having the desire to remain in their existing home and the reasonable belief in reliance of GMAC's representations that the loan modification was approved.

C. Plaintiffs suffered fees and costs on their accounts and/or Foreclosure/collection activity against their home.

D. Because GMAC improperly applied mortgage payments and/or held mortgage payments in "suspense" accounts rather than applying those payments to principal and interest, Plaintiffs suffered escalated debt obligations, including interest and other charges, and/or negative references to credit rating agencies.

E. Because GMAC did not timely notify the Galantes and waited almost a full year to advise them that their mortgage was allegedly in default, and demanded tens of thousands of dollars in order to bring their account current. GMAC created a hole the Galantes could not get out of despite having abided by the terms of the new contract.

F. Because OCWEN improperly returned mortgage payments made in February, March, April, May and June 2013, rather than applying those payments to principal and interest, Plaintiffs suffered escalated debt obligations, including interest and other charges, and/or negative references to credit rating agencies.

G. Because OCWEN refused to accept mortgage payments, Plaintiffs are subjected to additional financial losses including risk of foreclosure, late payment fees or penalties, and/or negative references to credit rating agencies.

H. Plaintiffs were subjected to improperly recorded notices of default regarding their mortgage loan.

78. Plaintiffs were threatened and continue to be threatened with unlawful foreclosure action. As a direct and proximate result of GMAC and OCWEN's actions, Plaintiffs have been living in fear each day that they will lose their home to foreclosure.

79. As a further direct and proximate result of GMAC and OCWEN's actions, Plaintiffs experienced anxiety and have become depressed as a result of their fear that their home could be foreclosed on any day despite having done everything GMAC required.

80. As a further direct and proximate result of GMAC and OCWEN's conduct, Plaintiffs suffered from mental anguish, which manifested physically through hair loss, migraines, and sleep loss.

81. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs' damages arising from this cause of action also include costs and expenses related to protecting themselves, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, punitive damages as authorized by law as well as fees and costs, including, without limitation, attorneys' fees and costs.

**COUNT I**
**DECLARATORY AND INJUNCTIVE RELIEF**

82. Plaintiffs incorporate all preceding paragraphs as set forth fully herein.

83. OCWEN acquired servicing rights in February 2013 and is liable for its own behavior.

84. Plaintiffs seek a declaration of their rights with respect to the status of their mortgage modification and their accounts with OCWEN.

85. Plaintiffs seek Declaratory and Injunctive Relief preventing OCWEN from executing a foreclosure until a decision on the merits has been made in this case as to whether OCWEN is contractually or otherwise obligated to abide by the terms of the permanent loan modification.

86. An actual controversy exists as to the true amount owed by Plaintiffs to Defendant and the correct amount of their monthly payments under the terms of the modified mortgage agreement.

87. Declaratory relief is appropriate pursuant to 28 U.S.C. 2201 and 2202 Md. Code Ann. And Cts. & Jud. Pro 3-401 to 3-415.

88. Plaintiffs are entitled to an injunction since OCWEN's actions are improper and illegal.

89. The public interest is served by preventing OCWEN from continuing to violate the various acts.

90. The burden imposed to Defendant OCWEN by requiring them to abide by the terms of the loan modification and Maryland laws and regulations is substantially outweighed by the harm suffered by Plaintiffs by allowing Defendant to ignore the law and regulations and threaten foreclosure proceedings.

WHEREFORE, Plaintiffs respectfully request the Court order appropriate injunctive relief to rectify past violations of law and prevent further violations of law; including a temporary restraining order, preliminary and permanent restraining injunction on any attempts to collect the arrearages Defendant's falsely claim they are owed relief; enter an Order enforcing the loan modification agreement entered into by Plaintiffs and GMAC Mortgage on or about May 24, 2011; Declare the loan modification agreement to be valid and enforceable; Order OCWEN to honor the terms of the permanent loan modification agreement and order appropriate declaratory relief.

## COUNT II
## VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")
## ACT 15 U.S.C § 1692, et seq.

91. Plaintiffs incorporate all preceding paragraphs as if set forth fully herein.

92. OCWEN regularly collects or attempts to collect debts owed or due or asserted to be owed or due another, and is a "debt collector" within the meaning of the FDCPA, as defined at 15 U.S.C. 1692(a)(6). OCWEN also uses one or more instrumentalities of interstate commerce or the mail in a business the principal purpose of which is the collection of debts.

93. Defendant OCWEN is a debt collector as defined by the FDCPA.

94. Defendant OCWEN acquired the Galantes' mortgage loan after their alleged default.

95. OCWEN violated the FDCPA, 15 U.S.C. § 1692f, by using unfair and unconscionable means to collect the alleged debt owed by the Plaintiffs, including the collecting and attempting to collect of interest and other charges, fees and expenses not authorized by the original Loan and Modification Agreement, or otherwise legally chargeable to Plaintiffs, as more fully set forth above.

96. OCWEN violated the FDCPA, 15 U.S.C. § 1692e (2), by sending false, deceptive, and misleading communications claiming that Plaintiffs are in default of their first mortgage (Loan No. 0601764191), that the payments they are making are not sufficient to cover the amount of their monthly payments, and requesting that Plaintiffs submit documentation to be considered for a loan modification.

97. OCWEN v i o l a t e d t h e F D C P A , 1 5 U . S . C . §§ 1692e(5) and 1692f(6), by threatening to foreclose on Plaintiffs' home even though OCWEN has no present right to possession of the property under the security agreement, repeated attempts to collect non-existent past-due amounts, fees and interest on those accounts and by threatening to take other action prohibited by law.

98. OCWEN violated the FDCPA, 15 U.S.C. § 1692g (a)(1), by failing to accurately and fully state in communications to the Plaintiff "the amount of the debt."

99. As a direct and proximate cause of Defendant's wrongful conduct, Plaintiffs suffered the damages outlined in paragraphs 77 through 81.

WHEREFORE, Plaintiffs demand judgment against Defendant, OCWEN for damages as outlined below in their Prayer for Relief.

## COUNT III
## MARYLAND CONSUMER DEBT COLLECTION ACT ("MCDCA"),
## MD. CODE ANN., COM. LAW, §§ 14-201 *ET SEQ.*,

100. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this paragraph herein.

101. The MCDCA provides that a debt collector may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist." MD. Code Ann. Com. Law 23 § 14-202(8). ("[K]nowledge can either mean actual knowledge or that the defendant acted with reckless disregard.").

102. Defendant OCWEN attempted to collect a debt arising from a mortgage on Plaintiffs' primary residence and is thus a "collector" within the meaning of the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law§ 14-201 (b).

103. Ocwen's conduct violated the MCDCA's prohibition on unfair or deceptive trade practice by sending collection letters, mortgage statements and notices to Mr. and Mrs. Galante that stated they were delinquent in their mortgage payments and were required to pay over $54,000.00 to cure the default or they would lose their home to foreclosure.

104. OCWEN sent notices that Plaintiffs' mortgage was in default despite the fact that Plaintiffs made all required payments under their loan modification agreement and were advised as such.

105. OCWEN informed Plaintiffs that the permanent loan modification was not valid due to their Bankruptcy, despite the fact that the loan modification trial began after their filing for Bankruptcy.

106. OCWEN knowingly misled the Plaintiffs by telling them that their permanent loan modification was denied because GMAC had not receive a signed HAMP Modification Agreement when in fact OCWEN had a copy of the fully executed agreement.

107. Once confronted with a copy of the fully executed HAMP Modification Agreement, OCWEN changed its' tactic and knowingly misled the Plaintiffs by telling them that the reason it would not honor the modification agreement was because the bankruptcy court needed to approve the permanent loan modification; when in fact, the bankruptcy code does not require court approval for a loan modification in a Chapter 7 bankruptcy case.

108. The Galantes sent letters to OCWEN dated February 14, 2013, March 1, 2013 and May 3, 2013 requesting that OCWEN honor the permanent modification agreement. Instead of ceasing the wrongful threats and foreclosure activities or investigating the matter in a reasonable and prudent manner as it is obligated, OCWEN refused the Plaintiffs' request and referred the account to the office of Samuel I. White, P.C., to commence foreclosure.

109. To date, OCWEN continues its wrongful conduct with full knowledge that a valid fully executed modification agreement exists.

110. Any "person" who violates any provision of this subtitle is liable to the person affected by the violation for all damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury and for reasonable attorney fees incurred by the person damaged. *See* §14-203 & § 14-304.

111. OCWEN continued sending letters threatening to foreclose on the Galantes' Property. As a result of Defendant OCWEN's deceptive and untrue communications, Plaintiffs have suffered economic and non-economic damages as described in the Complaint and incurred courts costs and attorney's fees.

112. As a direct result of OCWEN'S claiming a right with the knowledge that it did not exits, Plaintiffs suffered injury, loss and damages including but not limited to: emotional distress including but not limited to depression and extreme anxiety.

**WHEREFORE,** Plaintiffs demands judgment in the amount of to be determined by a jury, for damages against Defendant for emotional distress or mental anguish; be awarded his reasonable attorney's fees and costs and; that his claim should include such other and further relief as the Court deems just and proper.

### COUNT IV
### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT ("MCPA )
### MD Code Ann. Title 13 et seq.

113. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this paragraph herein.

114. Plaintiffs are consumers within the meaning of Title 13 Subtitle 1 §13-101(c)(l).

115. Defendant is a merchant within the meaning of Title 13 Subtitle 1 §13-101(g)(l).

116. Section §13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.

117. If Defendant's conduct proves to violate the MCDCA, as alleged in this Complaint, then Ocwen's conduct is also a *per se* violation of the MCPA. MD. Code Ann.; Comm. Law § 13-301(14)(iii).

**WHEREFORE,** Plaintiffs demand judgment in the amount of to be determined by a jury, for damages against Defendant for violations pursuant to MD. Commercial Law Code Ann. Title 13 Subtitle 4 §13-410; reasonable attorney's fees and costs; and that his claim should include such other and further relief as the Court deems just and proper.

## COUNT V
## BREACH OF CONTRACT

118. Plaintiffs incorporate all preceding paragraphs as if set forth fully herein.

119. As described above, the HAMP modification agreement sent by GMAC to Plaintiffs constitutes a valid offer.

120. By executing the permanent modification agreement and returning it to GMAC along with the supporting documentation, Plaintiffs accepted GMAC's offer.

121. GMAC subsequently executed the agreement; Plaintiffs and GMAC thereby formed a valid contract.

122. Plaintiffs sent OCWEN letters on three separate occasions advising them of GMAC's breach and requesting they do the right thing and honor the loan modification agreement. OCWEN refused and instead, threatened to begin foreclosure proceedings.

123. By failing to honor the executed permanent HAMP modification, GMAC and Defendant OCWEN breached the contract.

124. Plaintiffs remain ready, willing and able to perform under the contract by continuing to make payments in the modified amount.

125. Plaintiffs have suffered harm and are threatened with additional harm from GMAC's breach and OCWEN's continued refusal to honor the loan modification agreement. By making permanent modification payments, Plaintiffs forwent other remedies to save their home.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.  Assume jurisdiction of this case;

B.  Enter a judgment declaring the acts and practices of the Defendant complained of herein constitute a breach of contract;

C.  Grant a permanent or final injunction enjoining Defendant's employees, affiliates and subsidiaries, from continuing to harm Plaintiffs;

D.  Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

E.  Award compensatory damages against defendant not less than $1,000,000.00;

F.  Award actual damages statutory in the maximum amount allowed by law;

G.  Award punitive and exemplary damages against Defendant in a sum according to proof at trial;

H.  Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

I.  Award such other relief as the court deems appropriate.

## DEMAND FOR JURY TRIAL

Dated: August 15, 2014         Respectfully Submitted,

    /s/ Sari K. Kurland
Sari Karson Kurland, Esq.
The Kurland Law Group MD
Bar No. 09174
211 Jersey Lane
Rockville, MD 20850
Email: skurland2@comcast.net
*Attorney for Plaintiffs*

## CERTIFICATEOFSERVICE

I hereby certify that on this 15th day of August, 2014, I electronically filed the foregoing Plaintiffs' First Amended Complaint with the Clerk of the Court, using the CM/ECF system, which will provide notification to the following:

Mary Catherine Zinsner
U.S. District Court, D. Md. Bar No. 11763
Troutman Sanders LLP
1850 Towers Crescent Plaza, Suite 500
Tysons Corner, VA 22182
Telephone: (703) 734-4334
Facsimile: (703) 734-4340
mary.zinsner@troutmansanders.com
*Counsel for Defendant.*

/s/ Sari K. Kurland
Sari K. Kurland, Esq.
*Counsel for Plaintiffs*